**Allen A. HEMPSTEAD, Plaintiff,**

**v.**

**GENERAL FIRE EXTINGUISHER COR-
PORATION and Underwriters' Labo-
ratories, Inc., Defendants.**

**Civ. A. No. 2840.**

United States District Court
D. Delaware.

June 2, 1967.

James P. D'Angelo, Wilmington, Del., Arthur G. Raynes, Richter, Lord & Cavanaugh, Philadelphia, Pa., of counsel, for plaintiff.

William Prickett, Jr., Prickett, Ward, Burt & Sanders, Wilmington, Del., for defendant General Fire Extinguisher Corp.

H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., Edward H. Hickey, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., of counsel, for defendant Underwriters' Laboratories, Inc.

## OPINION

STEEL, District Judge.

Defendant, Underwriters' Laboratories, Inc., ("Underwriters") has moved for summary judgment upon the unverified pleadings, affidavit of W. S. Austin, deposition of plaintiff Allen A. Hempstead,[1] answer of plaintiff to interrogatories of Underwriters, and Underwriters' answers to plaintiff's interrogatories.

Plaintiff is a resident of Virginia, the defendants are Delaware corporations, with their places of business in a state other than Virginia, and the amount in controversy, exclusive of interest and costs, exceeds $10,000. Jurisdiction exists under 28 U.S.C. § 1332(a) (1).

Unless otherwise indicated, the following facts are either undisputed or that version of disputed facts most favorable to plaintiff.

On or about January 27, 1963 plaintiff, while employed by the Arlington Towers Apartment, was assisting in putting out a fire in one of its apartment buildings located in Virginia. As a result of an explosion of a fire extinguisher filled with soda acid, which was being operated by a co-worker, plaintiff was injured. The Complaint as amended[2] charges that the accident was caused

---

1. Although plaintiff's wife was originally a co-plaintiff, by stipulation the action has been dismissed with prejudice as to her.

2. Hereinafter the amended Complaint and amended answer will be referred to as Complaint and answer.

by the negligence of General Fire Extinguisher Corporation ("General") in manufacturing the extinguisher and in certain other particulars not presently germane. The Complaint also charges Underwriters, a testing company employed by General, with liability upon three theories: first, Underwriters was negligent in approving the design of the fire extinguisher despite the fact that the design was inherently dangerous and reasonably certain to place life or limb in peril or would become so if negligently made and manufactured;[3] second, Underwriters was negligent in allowing General to affix its [Underwriters] official label to the fire extinguisher, stating that it had been inspected and tested for 500 pounds of internal pressure when in fact it had not been; and third, the Underwriters' label so affixed constituted a misrepresentation by Underwriters as to its testing and inspection of the fire extinguisher.[4] This misrepresentation, it is alleged, was accomplished by Underwriters permitting General to affix to the extinguisher the following label:

"Tested 500 pounds

The General Detroit Corp.
Detroit, Mich., U.S.A.

The General Pacific Corp.
Los Angeles, Calif., U.S.A.

Underwriters [sic] Laboratories, Inc., Inspected"

■■ Since jurisdiction is based solely upon diversity of citizenship, the conflict of laws rule to be applied by this Court must conform to that which prevails in the Delaware state courts. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since plaintiff was a resident of Virginia and the accident occurred in that commonwealth, a Delaware court would apply the law of Virginia in determining substantive questions of liability. Friday v. Smoot, 211 A.2d 594, 595 (Del.Sup.Ct. 1965).

The question for determination is whether under Virginia law Underwriters, a testing corporation, can be held liable for plaintiff's injury based upon Underwriters' alleged negligence and misrepresentation when no relationship of privity exists between the parties.

For purposes of the present motion, it will be assumed that Underwriters did in fact negligently approve the design of the fire extinguisher manufactured by General.[5]

Underwriters neither manufactured nor sold the extinguisher. No privity of contract or any other legal relationship existed between Underwriters, the plaintiff, the plaintiff's employer, or plaintiff's co-worker who was handling the extinguisher at the time of its explosion. Because of these undisputed facts, Un-

---

3. It is apparent that plaintiff is intending to rely upon the contentions that the fire extinguisher was either inherently or imminently dangerous. Throughout this opinion it will be assumed, without deciding, that the fire extinguisher was not inherently dangerous. Whether the extinguisher was imminently dangerous will be the subject of later discussion.

4. While the Complaint also asserted liability on the part of both defendants for breach of warranties, this contention has now been abandoned. See Plaintiffs' Brief, filed October 8, 1965, Contra Defendant Underwriters' Laboratories, Inc. Motion for Summary Judgment at 15.

5. Underwriters contends that the explosion of the fire extinguisher was not caused by a defective design but was the result of the failure of the manufacturer, General, to adhere to the design in manufacturing the extinguisher; more particularly because of General's improper, insufficient and negligent brazing of the stainless steel body to the bronze collar and cap. This contention is based upon plaintiff's amended answer to interrogatory 22 of General in which plaintiff purports to set forth the specific acts of negligence with which he charges General. Plaintiff's amended answer to interrogatory 21 of Underwriters in which he details the specific acts of negligence of Underwriters is sufficiently comprehensive to support his charge that the negligence of Underwriters in approving the design of the extinguisher was a cause of its explosion.

derwriters contends that under Virginia law it can be under no liability to plaintiff even if it were negligent in approving the design of the fire extinguisher which it denies.

On June 29, 1962, an Act became effective in Virginia which provided that lack of privity between a plaintiff and a defendant is not a defense to an action brought against a manufacturer or seller of goods for breach of warranty, express or implied, or for negligence, if the plaintiff is a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods. Code of Virginia § 8–654.3.[6] This statute was in effect when plaintiff was injured.

■ The statute, it is to be noted, relates only to suits against manufacturers or sellers. Since Underwriters was neither, the statute on its face appears to be without relevance. Underwriters argues, however, that under the principle of *expressio unius est exclusio alterius*, the statute implicitly reflects a legislative intention to make privity indispensible to liability in a product liability case where, as here, defendant is not a manufacturer or a seller.

No Virginia or other authority cited by Underwriters justifies this interpretation of the 1962 Act, and the judicial history which immediately preceded its enactment tends to refute it. Harris v. Hampton Roads Tractor & Equipment Company, 202 Va. 958, 121 S.E.2d 471 (1961), was decided on September 8, 1961, less than four months before Home Bill No. 389, which eventuated in § 8–654.3, was introduced in the Virginia House of Delegates. It held that lack of privity was a bar to an action against a vendor based upon breach of warranty. In addition, on January 15, 1962, only two weeks before Home Bill No. 389 was introduced, the decision in General Bronze Corp. v. Kostopulos, 203 Va. 66, 122 S.E.2d 548 (1962), became final. Based in part upon lack of privity it denied a sub-vendee relief against a manufacturer based upon negligence. The promptness with which § 8–654.3 was enacted following the *Harris* and *General Bronze* decisions strongly suggests that its passage was designed to prevent any future application of the principles of those cases. See Emroch, Statutory Elimination of Privity Requirement in Products Liability Cases, 48 Va.L.Rev. 982, 984 n. 12 (1962) [hereinafter cited as Emroch].

So that the question whether Virginia would require privity as a condition to product liability in a suit such as the present one finds no clue in the passage of § 8–654.3. The answer must be ascertained from the Virginia decisions, and to the extent necessary, from other recognized sources, such as the Restatement of Law, treatises, law review commentaries and the majority rule. Venuto v. Robinson, 118 F.2d 679, 682 (3d Cir. 1941), cert. denied, 314 U.S. 627, 62 S.Ct. 58, 86 L.Ed. 504 (1941).

MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916) is generally looked upon as a landmark decision in the United States in the field of product liability. There, plaintiff had purchased an auto from a dealer and was injured when a wheel made of defective wood collapsed. Plaintiff sued the manufacturer of the car upon the theory that by purchasing the wheel from another manufacturer and placing it on the car without inspecting it, the de-

---

6. Section 8–654.3 read: "Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods; however, this section shall not be construed to affect any litigation pending at its effective date."

This statute was repealed effective January 1, 1966 by Code of Virginia § 8.2–318. This latter section, however, contains a provision which is substantially like the repealed section.

fendant became liable. The trial court instructed the jury that an automobile is not an "inherently dangerous" vehicle, in the sense that danger is not to be expected when the vehicle is well constructed. It submitted to the jury the question whether the defendant should have foreseen that the car, if negligently constructed, would become "imminently dangerous." A verdict for the plaintiff was affirmed upon appeal. The applicable law was thus stated at 1053:

> "We hold, then, that the principle of Thomas v. Winchester is not limited to poisons, explosives, and things of like nature, to things which in their normal operation are implements of destruction. If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

Judge Cardozo refused to accept what he characterized as the subtle distinction between things "inherently dangerous" and things "imminently dangerous", and stated that the case did not turn upon these verbal niceties. He said at 1055:

> "If danger was to be expected as reasonably certain [if the thing involved was negligently made], there was a duty of vigilance, and this whether you call the danger inherent or imminent."

While the opinion rejected the "imminently dangerous" phrase as the touchstone of liability, there can be little doubt that it aptly describes an article which, as the Court said at 1053, " * * * is reasonably certain to place life and limb in peril when negligently made * * *." for in those circumstances "[i]ts nature gives warning of the consequences to be expected."

In Pierce v. Ford Motor Co., 190 F. 2d 910 (4th Cir. 1951), cert. denied 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951), the Court at 914 rejected the contention that because of the then recent decision in Robey v. Richmond Coca-Cola Bottling Works, 192 Va. 192, 64 S.E.2d 723 (1951), the doctrine of the MacPherson case was not the law of Virginia. The Court in Pierce said that the reasoning in Robey clearly indicated Virginia's approval of the MacPherson rule. In Robey the Court had said 64 S.E.2d at 726, by way of dictum to be sure, that the general rule of non-liability on the part of a manufacturer to the user in the absence of privity of contract was subject to a well recognized exception, i. e., that a person who knowingly sells or furnishes an article which by reason of defective construction or otherwise is "imminently dangerous" to life or property, without notice or warning of the defect or danger, is liable to third persons who suffer therefrom. It added at 726 that beginning with MacPherson the recent cases had enlarged the liability of a manufacturer to a remote vendee to include articles, not "inherently dangerous", and not dangerous when properly constructed and put to their intended use, but which if defectively constructed might reasonably be anticipated to cause injury to those properly using them. This appropriately describes what is frequently called an "imminently dangerous" article.

In Robey the failure of plaintiff to prove that defendant was negligent relieved the court from determining whether "the former or modern" rule should prevail in Virginia. The Court acknowledged 64 S.E.2d at 726, however, that "the great weight of authority" had abandoned as unsound adherence to the rule which denied liability of a manufacturer of an article to a remote vendee because of lack of privity of contract.

In Pierce the Court also noted 190 F. 2d at 915 that long before the decision in MacPherson the Supreme Court of Appeals of Virginia in Standard Oil Co. v. Wakefield's Adm'r, 102 Va. 824, 47 S.E.

830, 66 L.R.A. 792 (1904), had laid down the principle on which *MacPherson* and the cases following it were bottomed. In *Wakefield's Adm'r* the City of Richmond had purchased naphtha from defendant, which delivered it in its own tank car. Because of a defect in the car, plaintiff, who was employed by the City, was injured by an explosion of the naphtha in unloading the car. A judgment for plaintiff was sustained against the contention that in the absence of privity of contract between plaintiff and defendant the latter could not be held liable.

There would appear to be some basis for questioning whether the actual holding in *Wakefield's Adm'r* reflects the "modern rule" of *MacPherson,* or only the law with respect to an inherently dangerous product. Emroch, 983 n. 5. The Court in *Wakefield's Adm'r* stated that it was a matter of common knowledge that naphtha was a dangerous substance and at 831:

"It seems to be a well-settled rule of the common law that a person who negligently uses a dangerous instrument or article, or causes or authorizes its use by another in such a manner or under such circumstances that he has reason to know that it is likely to produce injury, is responsible for the natural and probable consequences of his act to any person injured who is not himself at fault. The liability does not depend upon privity of contract between the parties to the action, but on the duty of every man to so use his own property as not to injure the persons or property of others. Carter v. Towne, 98 Mass. 567, 96 Am.Dec. 682."

But regardless of whether the precise holding in *Wakefield's Adm'r* was restricted to an inherently dangerous product, the Court indicated that it subscribed to a broader theory of liability based upon the reasonable foreseeability of injury resulting from the negligence in the preparation or construction of a product. The Court said at 831:

"Whether this rule of the common law is applicable only, as the counsel of the oil company insists, to such agencies as are essentially and in their elements instruments of danger to life and property, may be doubted."

And at 832 the Court quoted with approval the following language from 21 American & English Encyc. of Law 461–2 (1896):

"Where there has been negligence in the construction or preparation of the article sold or supplied—that is, where, under the circumstances, injuries to the other contracting party or third persons might reasonably have been anticipated as a result of defects or errors therein—the question of privity of contract seems wholly immaterial. The liability depends upon the rule of natural and proximate cause and contemplation of consequences."

In an article The Assault Upon the Citadel (Strict Liability To The Consumer), 69 Yale L.J. 1099 (1960), Dean Prosser observed at 1100 that in the years succeeding its announcement the *MacPherson* principle had swept the country and "with the barely possible but highly unlikely exceptions of Mississippi and Virginia, no American jurisdiction now refuses to accept it." In support of this statement, Prosser cited at 1100 n. 8 Robey v. Richmond Coca-Cola Bottling Works, Inc., supra, and H. M. Gleason & Co. v. International Harvester Co., 197 Va. 255, 88 S.E.2d 904 (1955) (a breach of warranty case). The breadth of acceptance of the *MacPherson* principle in product liability cases has likewise been expressed in 43 Va.L.Rev. 273 (1957) as follows at 273:

"However the requirement of privity for a tort action has gradually disappeared until today the manufacturer's duty of care generally extends to any injury or damage which foreseeably may result from defects in his product."

All of the authorities and articles thus far discussed antedated Harris v. Hampton Roads Tractor & Equipment Co., supra, and General Bronze Corp. v. Kostopulos, supra. The *Harris* case clearly

is not inconsistent with the *MacPherson* rule. In *Harris,* defendant was a dealer who had installed a tag line on a crane owned by plaintiff's employer. In operating the crane plaintiff was injured by the tag line because of defendant's alleged negligence in installing it. A verdict for defendant was affirmed. While the decision does not discuss the need for privity, it is clear from the jury charge which was approved at 475 that if plaintiff's injury had been caused by the negligent installation, defendant would have been liable even though no privity between the parties existed.

In General Bronze Corporation v. Kostopulos, supra, the sub-vendee sued the manufacturer of sliding doors for alleged negligence in their design and construction which resulted in rain damage to plaintiff's property after the doors had been installed. A verdict for plaintiff was reversed on appeal. The decision was based in part upon the fact that negligence had not been proved. In addition, the Court accepted the argument of the defendant that a plaintiff cannot recover from a manufacturer of a product not inherently dangerous alleged to have caused injury on the basis of negligence when no privity of contract exists between them. The Court said, 122 S.E.2d at 551:

> "Virginia is not among those jurisdictions which have repudiated the privity requirement in toto. * * * In many jurisdictions privity of contract is not required for recovery for negligence by a remote vendee where the manufactured product is inherently dangerous, and we are in accord with the view. A product is inherently dangerous when the danger of injury stems from the product itself, and not from any defect in it. 74 A.L.R. Anno. 2d, § 8, p. 1146. There is nothing inherently dangerous about the doors in question and they do not fall within this classification."

Because of this language Underwriters argues that prior to the enactment of § 8–654.3, unless a product was inherently dangerous, privity under Virginia law was essential to recovery for product liability based upon negligence. On its face the opinion would appear to support this view. But its force is weakened when it is observed that the Court simply dealt with the "inherently dangerous" argument which defendant had presented. The opinion contains in no discussion of the imminently dangerous exception recognized as part of Virginia law in Pierce v. Ford Motor Company, supra; Standard Oil Co. v. Wakefield's Adm'r, supra; and Robey v. Richmond Coca-Cola Bottling Works, supra. None of these cases were cited or discussed. It is to be doubted that the Court in *General Bronze* intended to repudiate the imminently dangerous exception to the privity requirement which theretofore had been acknowledged as existing under Virginia law. Indeed, in the later decision of City of Richmond v. Branch, 205 Va. 424, 137 S.E.2d 882 (1964) the court at 885–886 referred to the "inherently or imminently dangerous" exception to the rule of non-liability there under consideration as though "inherently dangerous" and "imminently dangerous" were co-equal in their significance.

It may perhaps be that the fire extinguisher is not an "inherently dangerous" article as defined in General Bronze Corporation v. Kostopulos, supra. It is, however, made of metal and is filled with a chemical under 500 pounds per square inch pressure. Obviously, it is a product fraught with danger of potential harm to any user if defectively manufactured. The probability that harm will result from a defectively constructed extinguisher should have been reasonably foreseen by the manufacturer. The extinguisher is clearly an article which may be characterized as "imminently dangerous" as the term was used in Robey v. Richmond Coca-Cola Bottling Works, 192 Va. 192, 64 S.E.2d 723, 726. It is a product which is embraced within the enlarged liability recognized in Virginia even before the enactment of Code of Virginia § 8–654.3. Certainly the sliding doors which were dealt with in the *General Bronze* case are far

less susceptible of occasioning injury to life or property if defectively constructed than the fire extinguisher involved in the present case. The probability of harm resulting from defects makes the harm reasonably foreseeable in the case of the fire extinguisher whereas such was not true in the case of the sliding doors. A duty on the part of a manufacturer to foresee the danger therefore existed in the former situation where it did not in the latter.

So far the discussion has involved Virginia law bearing upon product liability for negligence of a manufacturer or a vendor in the absence of privity. But such *indicia* as exists, suggests that under Virginia law responsibility in such cases will not be limited to manufacturers and vendors. In City of Richmond v. Branch, supra, the Court affirmed a a judgment in favor of an independent contractor who had been sued by a person injured on the street because of the alleged negligence of the contractor in installing a sewer. The Court stated at 885 of 137 S.E.2d, the general rule to be that after an independent contractor has completed his work and turned it over to the owner or employer and the same has been accepted, the independent contractor is not liable for an injury to a person or to property of one who is not a party to the contract with it, even though the injury resulted from the contractor's failure to properly perform his contract. The Court stated, however, that this rule is subject to exceptions, and strongly intimated that if plaintiff had shown that the sewer line was "inherently or imminently dangerous" an exception to the rule would have existed.

Further support for the view that under Virginia law liability based upon negligence, in the absence of privity, is not limited to a manufacturer or vendor, is found in Jones v. Otis Elevator Co., 231 N.C. 285, 56 S.E.2d 684 (1949). There, the Supreme Court of North Carolina applied Virginia law and affirmed a judgment in favor of a plaintiff who fell into an elevator shaft because of the negligence of the defendant in servicing the elevator under a contract with the owner of the premises where plaintiff was working.

No decision in Virginia or seemingly elsewhere has dealt with the issue of the liability of a testing company such as Underwriters.

Underwriters is a non-profit service organization sponsored by the National Board of Fire Underwriters. Its function is to render services in the field of fire, crime, and casualty prevention. It maintains laboratories and testing facilities in Chicago and other cities. It determines by scientific investigation and tests the relation of various materials, devices, constructions and methods of life, fire and casualty hazards. It establishes requirements or standards of construction and performance with which a product must comply in order to be "listed" in a publication which Underwriters makes available to interested parties and to the public. Before "listing" a product, Underwriters tests the product to determine whether it meets its requirements or standards. If it does, the product is listed in a publication which Underwriters issues annually and supplements bi-monthly. The publication states the name of the product and the concern which manufactures it.

More than 375,000 products are listed in these publications. Fire extinguishers, including those manufactured by the General, are and at and prior to the time of the accident were listed in the Fire Protection Equipment List published by Underwriters.

In addition to the "listing" service, Underwriters also provides a "labeling" service. Under this service a manufacturer is permitted by Underwriters to attach labels to such of its products as are found by examination and tests conducted by the manufacturer to be in compliance with the requirements or standards of Underwriters. The label bears the words "Underwriters' Laboratories, Inc." and the word "Inspected". Representatives of Underwriters conduct inspections at the factory of the manufacturer of a listed product for the pur-

pose of checking the efficiency of the manufacturer's own inspection program. If the inspection by Underwriters discloses features of the product not in conformity with its requirements or standards, Underwriters requires the manufacturer either to correct the features or to remove the labels from the products. The label attached to the extinguisher which exploded has been previously described.

Underwriters argues that it does not approve "designs" of products, and specifically that it did not approve the design of the fire extinguisher manufactured by General. Before listing a product Underwriters tests the product to see whether it meets the standards of construction and performance it has established as a pre-requisite to safety after its investigations and tests have been made. If satisfied that it does, Underwriters lists the product. If satisfied that it does not, Underwriters refuses to list the product. It is straining at words to say that Underwriters does not approve the design of a product. The design may originate with the manufacturer, but when Underwriters lists it, it thereby tacitly impresses its approval upon the design.

The approval by Underwriters of fire extinguishers manufactured by General implicit in their listing was unquestionably of aid to General in selling to Arlington Tower Apartments the extinguisher which exploded. The Fire Prevention Code of Arlington County, which was in effect at the time of the explosion required the Fire Prevention Supervisor to specify for each apartment house in the county suitable fire extinguishing appliances and made their installation compulsory. The Fire Prevention Code authorized the Fire Prevention Supervisor to rely upon the services of any recognized testing authority, including Underwriters, to determine the suitability of a particular type of fire extinguisher, and a listing by any such authority permitted the Fire Prevention Supervisor to find such extinguisher suitable for installation. Fire Prevention Code for Arlington County, Virginia, §§ 1.13(a) and 13.02 and § 13.14 (Amendments Made in the Fire Prevention Code).[7]

The arrangement between General and Underwriters contemplated that the latter would prescribe standards of construction and of materials which would render the fire extinguishers safe for use by any one of the multitudinous persons who might have occasion to utilize them.

■ Underwriters knew or should have known of the type of construction and materials which would be required if the hazards involved in the use of the extinguishers were to be avoided.

The authorities discussed do not answer the precise question here presented —the liability of a testing company without any relationship of privity to plaintiff for negligently approving the design of an imminently dangerous product which results in plaintiff's injury. The cited cases do, however, show a trend in Virginia toward broadening the scope of those to whom responsibility attaches when injury results from an imminently dangerous product.[8] In the case of such a product the once formidable barrier of privity appears to be largely a thing of the past. While the cited decisions by

7. See also Virginia Fire Safety Regulations adopted by the Virginia State Corporation Commission under Code of Virginia § 27-72. Sections 200(c) and 1200 (c) both provide:
   "Equipment listed as satisfactory for specific purposes by nationally recognized testing laboratories (such as the Underwriters' Laboratories, Inc., the Factory Mutual Laboratories, and the American Gas Association), when installed and used for the purposes intended, will be accepted as approved. * * *"

8. Strictly speaking, City of Richmond v. Branch, supra, and Jones v. Otis Elevator Co., supra, are not product liability cases. They are significant, however, in showing the development of Virginia law in its tendency to disregard defenses based upon lack of privity even in actions against those who are not manufacturers or vendors.

no means control the instant case, they at least emphasize that today, even in the absence of Code of Virginia, § 8.2–318, in Virginia the former strictures of privity present no obstacle of importance in a product liability case.

No decisional law directed to the liability of a testing company has been uncovered. Restatement, Second, Torts § 324A, however, is pertinent. It states in part:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm * * *."

The alleged failure of Underwriters to exercise reasonable care in approving the design of the extinguisher has obviously increased the risk of harm to plaintiff over that which would have existed if reasonable care had been exercised. It may be that the principle of liability stated in § 324A is not limited to what has been characterized as an imminently dangerous product. If § 324A is not interpreted to be restricted to such a product, there is all the more reason for applying the principle to an imminently dangerous product such as the fire extinguisher is.

Under the principles stated in § 324A, subparagraph (a), Underwriters would be liable. The distinction and prestige which the Restatement has long enjoyed makes it probable that a Virginia Court would apply § 324A to the instant case. This conclusion is fortified by the trend in Virginia, as manifested in the decisional law heretofore discussed, to broaden the area of accountability in product liability cases, and to reduce correspondingly the situations in which privity has been required as a condition to liability.

■ If plaintiff succeeds in proving his charge that Underwriters was negligent in approving the design of a fire extinguisher which was imminently dangerous, and that plaintiff's injury was a result thereof, Underwriters must respond in damages. Since this is so the action will have to be tried. It is, therefore, unnecessary to determine at this time the validity of the other theories which the plaintiff has pleaded.

The renewed motion of Underwriters for summary judgment will be denied.