BENCO PLASTICS, INC.

v.

WESTINGHOUSE ELECTRIC CORP.

CHEKER OIL COMPANY

v.

BENCO PLASTICS, INC. and Westing-
house Electric Corp.

v.

UNDERWRITERS' LABORATORIES.

Civ. A. Nos. 8317 and 8457.

United States District Court,
E. D. Tennessee, N. D.

July 19, 1974.

 

William P. Newkirk, Kenneth E. Hall, Egerton, McAfee, Armistead, Davis & McCord, Knoxville, Tenn., for Benco Plastics, Inc.

Philip P. Durand, Knoxville, Tenn., for Cheker Oil Co.

James A. Ridley, III, R. Arnold Kramer, Kramer, Dye, Greenwood, Johnson, Rayson & McVeigh, Knoxville, Tenn., for Westinghouse.

Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., McCampbell, Young, Bartlett & Woolf, Knoxville, Tenn., for Underwriters'.

MEMORANDUM

ROBERT L. TAYLOR, District Judge.

*Introduction*

This action is a consolidation of cases 8317 and 8457 and in both cases jurisdiction is based on diversity of citizenship.

In Case Number 8317, Benco Plastics claims that Bryant Electric (a division of Westinghouse Electric Corp.) [1] misrepresented the quality and character of neon lampholders and that Bryant relied on such misrepresentations. Additionally, by way of amended complaint, Benco claims that Underwriters' Laboratories (U.L.) misrepresented the quality and character of the same product when U.L. listed and made the representation that the lampholders in question were suitable for outdoor use. Pursuant to Pretrial Order, the plaintiff in 8317 relies solely upon applicable theories of tort law as articulated under the common law and the Restatement of Torts, Second, and does not rely upon any theory of warranty law as set forth under the Uniform Commercial Code.

In Case Number 8457, Cheker Oil Company, a purchaser of outdoor signs from Benco, claims that Benco negligently misrepresented to Cheker that certain outdoor display signs which Benco sold to Cheker from 1968 to 1972, and which incorporated the Bryant lampholders in question, were free of defects and suitable for plaintiff's intended use. Cheker, in the alternative, adopts the theories of Benco in Case Number 8317 as against Bryant. Benco, in turn, filed a third party complaint against U.L. and a cross claim against Bryant alleging that any responsibility for misrepresentation lay with Westinghouse and U.L. Cheker's action against Benco is premised upon theories of both tort and warranty.

This case was tried before the Court without a jury and, pursuant to Rule 52, F.R.Civ.P., the following findings of fact and conclusions of law are made.

Benco Plastics, which locally employs approximately 100 persons, is engaged in the design, production and selling of enclosed outdoor signs. These signs are typical of the outdoor variety and are principally constructed of embossed or formed plastic mounted on an aluminum frame. An interior electrical system, consisting in the main of a ballast, lampholders, and neon lamps, serves to illuminate the exterior plastic surfaces at night.[2] The interior electrical wiring and lampholders are situated within a protective metal structure referred to as the raceway. The neon lamps and raceways may be mounted either horizontally or vertically within the sign's interior frame. Underwriters' Laboratories certified and listed both Benco's finished signs and the Bryant lampholders.

The Bryant Division of Westinghouse, located at Bridgeport, Connecticut, manufactures approximately 14,000 electrical products, including 200 different styles of fluorescent lampholders.[3] In 1964, Mr. James McLaughlin, a Bryant design engineer, first designed the original 620S and 620P [4] fluorescent lampholders. Evidently, Mr. McLaughlin's development of the original 620 series was

---

1. Bryant and Westinghouse will be used interchangeably.

2. In some cases an optional motor located at the sign's base rotates the sign on an axle.

3. Bryant sells approximately 30 million lampholders a year.

4. Each of the two raceways in an enclosed outdoor sign of the type under examination here contains either stationary or plunger type lampholders denominated 620"S" (stationary) or 620"P" (plunger), respectively. The plunger lampholder allows the neon lamp to be mounted by snapping the same into place between the two lampholders. The plunger thus serves to provide lamp contact and relative ease in mounting. The stationary lampholder consists, in the main, of two parts: a base made of phenolic and a metal bezel or cap coated with zinc to prevent rusting. The plunger model is basically the same, except in that case the plunger is made of urea instead of phenolic.

prompted by Bryant's marketing department's determination that there was a potential market for such an outdoor snap-in fluorescent lampholder. In designing the 620 lampholders, Mr. McLaughlin examined similar lampholders manufactured by competitors, in particular, lampholders designed by General Electric and Leviton. The original 620S and P were first formally manufactured and distributed in 1965.

In the early part of 1966, Mr. James Foley, a manufacturer's representative, contacted Mr. Ronald Smith, at the time the purchasing agent at Benco, and presented the 620S and P lampholders to him for possible incorporation into Benco's outdoor signs. Samples of the 620S and P lampholders were forwarded to Benco and at a second visit to Benco's plant, Mr. John Kofoed, Bryant's sales manager at the time, and Mr. Foley again presented the 620 lampholders. During this second visit, Mr. Foley and Mr. Kofoed were shown through the Benco plant by Mr. Smith and were made aware of the use for which the lampholders were intended. At that time, Mr. Kofoed gave Mr. Smith a catalog page from Bryant's catalog, which described the features of the 620S and P lampholders. (Exhibit 5). Included under a listing of the lampholder's features is a final statement appearing at the bottom of the page: "Approved for use in enclosed outdoor signs and fixtures."

On November 29, 1969, Benco placed an initial order for 5,000 sets of lampholders. (Exhibit 11). Although a specific date was not mentioned, some time after Benco received its initial order on December 19, 1966, Mr. Smith received a complete Bryant catalog which included sheet number 49 entitled "standard conditions of sale." (Exhibits 9 and 10). Benco continued to order 620S and P lampholders from Bryant until Benco terminated its relationship with Bryant sometime in January 1973 as a result of its belief that the lampholders were defective. During this period from 1966 to 1972, Benco purchased over 400,000 lampholder pairs from Bryant. In 1965, the 620S and P lampholders were listed by Underwriters' Laboratories for use in enclosed outdoor signs.

As a result of requests by its customers for the production of a thinner stationary socket and the need on Bryant's part to increase production capacity, Bryant in 1965 under the direction of Mr. Roy Wiley, Manager for the Engineering Section, designed and manufactured a "low profile" 620S lampholder. Originally, Mr. Landisi, Product Manager in Charge of Marketing at Bryant from June 1957 to June 1973, requested Mr. Wiley to design the new lampholder to be interchangeable with the existing 620S lampholder which had been suitable for outdoor use. Ultimately, however, the new low profile 620S lampholder was not designed to be interchangeable with the old 620S lampholder because the thinner more compact design of the new 620S did not comply with Underwriters' Laboratories' standards for minimum spacing [5] for use in an outdoor en-

5. Spacing, a ubiquitous term appearing throughout the course of this trial, is that minimal distance between live electrical points that is sufficient under the existing conditions to prevent an electrical charge or arcing to occur between the points. The two standards most often before the Court, the Underwriters' Laboratories Standards and the National Electrical Code, generally recognize three factors in calculating the appropriate spacing requirement—(1) the amount of potential voltage flowing between the electrical points, (2) whether the spacing is to be measured over surface material or over the air and (3) whether the spacing is between live electrical parts of opposite polarity or between live parts and ground. Plaintiff alleges that, although the new 620S does not comply with the applicable standards for spacing between points of opposite polarity, the burnouts of the lampholders were due to inadequate spacing between the live parts of the socket and the ground.

In this regard, the Underwriters' Laboratories, Inc. "Standards for Safety" for lampholders, starters, and starter lamps for flu-

vironment. Mr. Wiley testified that he thought he had advised the Marketing Department that the new 620S was not designed for indoor use. More specifically, Exhibits 64 and 65, respectively, indicate that while the old 620S lampholder (after 1969 denominated 620-SO) complied with the minimum through air spacing of the U.L. standards, the new low profile 620S did not comply with the same standard. That is to say, the reduction in spacing between the live contact points of the lampholder and the bezel (ground) of the lampholder from .390 inch to .196 in the 1969 low profile design caused the 620S lampholder to be in noncompliance with the U.L. standard for outdoor use. It is significant to note that, according to Exhibit 63, the spacing between the live contact point and the grounded bezel of .390 inch is the same in the 620P (plunger) as the old 620S.

On April 22, 1969, Mr. F. E. Devlin, a laison engineer with Bryant, submitted to U.L. twelve samples of the new 620S and requested that the Laboratories list the redesigned lampholder like its former companion lampholder but specifically noted that the redesigned lampholder was "for indoor use only." (Exhibit 50). Thereafter, on May 2, 1969, Mr. Devlin received from U.L. a "Notice of Acceptability For Listing," (Exhibit 51) which, as the name implied, informed Bryant that the product was acceptable to Underwriters'. The Laboratories' May 21, 1969 report on the new low profile 620S indicated the lampholder was similar to its former model but that with respect to spacing, the report indicated that they were "Min. ⅛ in. [for indoor use] through air and over surface between live metal parts of opposite polarity and between live metal parts and dead metal parts." (Exhibit 52, Sec. 5, page 5). Thereafter, Bryant received from U.L. a guide care which in essence was a listing of Bryant lampholders that had been approved by U.L. This listing indicated by the use of an asterisk following the catalog number that the new 620S was "also for use in enclosed outdoor signs." This card was a duplication in part of the listing that appeared on page 189 of the August 1970 Underwriters' Laboratories, Inc.—Electrical Construction Materials List, (Exhibit 12), which was distributed to the public and which likewise indicated that the new 620S lampholder was "also for use in enclosed outdoor signs."

Mr. Smith testified that in July or August 1969 Benco received from Bryant a shipment of the new 620S lampholders.

orescent lamps published both in 1966 and 1969 provides in pertinent part:

Spacings

Except as noted in paragraph 111 [paragraph 109 in 1966 standards], the spacings between uninsulated live metal parts of opposite polarity, and between an uninsulated live metal part and a dead metal part (including a metal surface on which the holder is properly mounted) that is liable to be grounded or exposed for persons to contact when the device is installed in the intended manner, shall not be less than those shown in Table 3.

TABLE 3

MINIMUM ACCEPTABLE SPACING IN INCHES

| Rating of Holder in Volts | Holder for Outdoor Use | | | | Holder Not for Outdoor Use | | | |
|---|---|---|---|---|---|---|---|---|
| | At Wiring Terminals | | At Points Other than Wiring Terminals | | At Wiring Terminals | | At Points Other than Wiring Terminals | |
| | Thr. Air | Over Surface | Thr. Air | Over Surface | Thr. Air | Over Surface | Thr. Air | Over Surface |
| 600 | ⅜ | ½ | ⅜ | ½ | ¼ | ¼ | ⅛ | ⅛ |

Since the low profile lampholder differed considerably in appearance from the old 620S as a result of the reduced profile, Mr. Smith contacted a Bryant representative about the change and was assured by Bryant that the new 620S was just as good as the old lampholder in every respect. Having received the assurances that the new 620S could be incorporated into Benco's outdoor signs, Mr. Smith made no further inquiries regarding the lampholders' electrical and functional properties. Mr. Smith testified that when he initially inquired about the new low profile 620S lampholder in 1969 he was informed by Bryant that the old 620S lampholder had been discontinued and could not have been purchased even if Benco had specifically requested the old 620S.

Around September 1971 Benco began receiving its first complaints from purchasers of its signs that certain signs were experiencing "burnouts." [6] Mr. Simpson Duncan, Chief Engineer with Benco until he left the company in February of 1973, in conjunction with Mr. George Herbold, an Underwriters' Laboratories inspector, sought to locate the cause of the burnouts. Mr. Duncan testified that in this process of examination they 1. checked for rough places on the raceway that might cut the sign's wiring, 2. examined the wire leads that plugged into the sockets and tinned them to prevent fraying,[7] 3. examined the ballast wiring, and 4. prewired the sockets. A letter of November 16, 1972 from U.L. to Mr. Herbold approved prewiring the lampholders and again noted that "[a] check of the Listing Card covering these lampholders indicates that there is a note indicating that they are specifically suitable for use in enclosed outdoor signs." (Exhibit 16). Mr. Duncan stated that their attempts to locate the cause of the burnouts was without success and that consequently Benco began to phase out the use of the new 620S socket with the advent of a new sign program. Despite this phase out, Benco continued to send finished signs with 620S lampholders to its customers.

In January of 1973, following a conversation with U.L.'s Chicago office, Mr. Herbold reported to Mr. Duncan that he had been informed that the 620S sockets had not been approved for outdoor use. Benco thereafter stopped production of any signs using the 620S lampholders. Sometime in January 1973, Mr. Teed, Marketing Coordinator for Bryant, received a formal complaint from Benco regarding the burnouts of the lampholders. Mr. Teed thereafter visited the Benco plant in April 1973 and requested some samples of burned out lampholders from Benco. Except for one pair of burned out lampholders, Bryant never received any lampholders from Benco. Benco commenced this suit on June 29, 1973.

## Theories

As framed by the pre-trial order, plaintiff contends that Westinghouse assured Benco that the 620 lampholders were suitable for outdoor use and, in particular, that the new 620S lampholder was just as good, if not better, than the original version of the 620S; that Benco relied upon such representations from 1966 through January 1973; that due to certain qualities of the lampholders (in particular the new 620S) they were in fact not suitable for use in outdoor

6. The term burnout generally referred to the burning and consequent destruction of the electrical components, including the lampholders, contained within the sign's raceway. This burning was allegedly precipitated by electrical arcing within the lampholders between live and ground points which in turn caused the phenolic base of the lampholder to burn and ultimately carbonize. In some instances, albeit limited, the fires spread from the raceway to consume the entire sign. The Court, however, was apprised of only a few instances in which the sign in its entirety was destroyed.

7. During cross-examination it was noted that the instruction sheet which accompanied the 620S lampholders from Bryant did not recognize the use of stranded wire that had not been "soldered, dipped, or bonded stranded." Despite this instruction, Benco did not use dipped leads until the latter part of 1971.

signs, contrary to Bryant's former representations; and that as a result of these defects the lampholders, when placed in an outdoor environment, burned out.

At trial Benco, largely through expert testimony sought to prove the lampholders were not suitable for outdoor use due to the collective effect of several defects. Thus, Benco claims that the following, either alone or in conjunction with each other, rendered the lampholders in question unsuitable for use in an enclosed outdoor sign:

1. The absence of proper spacing in the low profile 620S as evidenced by its noncompliance with U.L. standards.[8]

2. The presence of soluble zinc chloride on the lampholders, which acted as an electrolyte when mixed with moisture in the form of condensate in the air. This mixture of condensate and electrolyte, with its ability to act as a conductor of electricity, would cause arcing between live electrical parts of the lampholder and the grounded bezel of the lampholder.

3. The presence of cracks in the phenolic base of certain lampholders, caused by excessive crimping of the bezel during the assembly process at the Bryant plant. Such cracks, under plaintiff's theory, collected condensate from the air which likewise promoted arcing between live electrical parts and the grounded bezel.

4. The use of wood filler phenolic as a plastic base for the lampholders, which because of its chemical properties deteriorates electrically when subjected to humidity. Plaintiff's expert submitted that with this consequent deterioration of the phenolic base, the likelihood of arcing increased proportionately, ultimately resulting in the burnouts.

5. The inadequacy of the protective zinc coating applied to the metal bezel. In the absence of sufficient protection, the bezel would ultimately corrode when exposed to humidity.

6. Finally, the presence of voids or air pockets in the phenolic base, which reduced the insulative ability of the base.

With regard to Underwriters' Laboratories, Benco claims that U.L. approved the new 620S lampholder for use in outdoor signs, when, like Bryant, it had knowledge of the fact that the lampholders were not suitable for use in outdoor signs since the new 620 lampholder did not comply with the Laboratories' own standards for spacing in outdoor electrical components; and that Benco relied upon such misrepresentations from 1969 until January 1973.

Although both Bryant and Underwriters' assert various legal defenses to Benco's claim of injury, their principal defense is the age-old defense of causation. Both defendants vigorously assert that Benco's burnouts, and any injury resulting as a consequence of such burnouts, resulted, not from Bryant's representations concerning the lampholder's suitability for outdoor use or the alleged defects, but rather from rainwater that was permitted to enter and permeate the sign's interior. More specifically, Bryant contends that condensation alone could not have caused arcing but instead submits that rainwater entered the interior portion of Benco's outdoor signs and collected in the sign's raceway, ultimately causing the lampholders to sit in water. Thus, rainwater, and not condensate, whether in a pure nonionized state or containing impurities, under Bryant's theory caused the low profile 620S to burn out. Bryant, therefore, attributes the burnouts to Benco's own negligence in the defective construction of its signs or the negligence of some third party in the erection and maintenance of the signs and contends that while the new 620S was not designed for outdoor use, it will function properly in properly manufactured outdoor signs.

Under a similar theory, Underwriters' Laboratories asserts its own standards

8. See note 4, supra.

as a defense. It contends that due to U.L.'s certification of Benco's completed signs Benco was under a continuing obligation to manufacture its signs in compliance with U.L.'s safety standards for enclosed outdoor signs which required Benco to manufacture a sign in compliance with electrical standard number 5.11 of the Underwriters' Standards for Safety for Electric Signs, which reads in part:

> The enclosure of an outdoor sign shall be so constructed that, if the sign is subjected to a beating rain:
>
> A. Water will not contact (1) a fluorescent lampholder of other than the weather proof type, (2) a fluorescent lamp mounted in other than a horizontal position, unless the lampholder is of the weather-proof type . . .
>
> B. Water will not enter (1) a splice compartment provided as part of an outdoor-type ballast, . . . (3) a compartment housing appliance-wiring material conductors, . . . *Electrical Sign Standards*, at page 8

Underwriters' draws on Bryant's proof to show that Benco did not in fact manufacture a sign that complied with standard 5.11. Thus, Underwriters', like Bryant, contends that the proximate cause of Benco's burnouts was rainwater and not condensate. Ultimately, a determination of causation in this instance boils down to whether condensate or rainfall caused the burnouts.

Cheker claims that it purchased outdoor signs from Benco during a period from 1968 to 1972 and that since such signs have proven defective, regardless of causation, Benco has breached both its implied and expressed warranties. Further, Cheker claims that any limitations contained in Benco's warranties to Cheker are ineffective.

While the primary focus in this case was on the factual issue of causation and defect, it is appropriate at this point to examine both parties' respective legal contentions. In passing, the Court recognizes that the corporate nature of the parties to this suit places these legal issues in a different if not unique posture. Thus, this is not a product liability suit between a manufacturer and an ultimate citizen consumer, but rather one between three corporations, albeit corporations of dissimilar size and structure. While this character of the parties is not alone dispositive of any single issue of law, it does provide a setting in which the Court must consider the parties' relative bargaining positions.

### Bryant's Limitation of Liability and Remedies

■ Westinghouse seeks to assert against Benco various limitations of liability and remedies contained presently at page 97 in its catalog.[9]

More specifically, Westinghouse claims that by using catalog numbers 620S and 620P on its order forms Benco incorporated the entire Bryant catalog,

---

9. "Bryant warrants that its products will be free of defects in workmanship and material. Should any failure to conform to this warranty become apparent during a period of one year after the date of shipment, Bryant shall, upon prompt written notice from the purchaser, correct such non-conformity by repair or replacement, F. O. B. factory, freight collect, of the defective part or parts. Correction in the manner provided above shall constitute a fulfillment of all liabilities of Bryant with respect to the quality of the product. The foregoing warranty is exclusive and in lieu of all other warranties of quality whether written, oral, or implied (including any warranty of merchantability or fitness for purpose).

\* \* \* \* \*

"Neither party shall be liable for special, indirect, incidental, or consequential damages. The remedies of the purchaser as set forth herein are exclusive and the liability of Bryant with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warranty or otherwise, shall not except as expressly provided herein, exceed the price of the equipment or part on which such liability is based."

and its accompanying limitations, as a part of the sales agreement. Plaintiff responds that as a matter of fact, the Bryant catalog was never part of the parties' understanding and relationship. In the opinion of the Court, the record in this instance, the colloquy between Bryant's sales agents and ·Benco's purchasing agent, and the sequence of commercial events supports plaintiff's position. Thus, Bryant's "standard conditions of sale," is ineffective to modify or limit Benco's traditional legal remedies.

As noted above, the evidence shows that the initial sales transaction between Benco and Bryant was completed on December 19, 1966, before Benco ever received the Bryant catalog. Nothing in the oral conversations between Mr. Foley and Mr. Smith at their first meeting or in the single catalog page submitted to Mr. Smith by Mr. Kofoeb at the second meeting advised Benco that Bryant sought to limit Benco's remedies in the event the lampholders were defective. Additionally, nothing in the initial order form of November 11, 1966 (Exhibit 11) or the order form of January 1, 1972 (Exhibit 20),[10] although prepared by Benco, recognize any limitations on Benco's remedies. It is not until the parties' relationship was well established and solidified that Benco even received the Bryant catalog. In this posture, Benco's continued use of the catalog numbers 620S and 620P subsequent to making its initial purchase on November 11, 1972 and after receipt of the Bryant catalog cannot be interpreted as an automatic and unequivocal acceptance on Benco's part of the terms contained in the Bryant catalog. It should be emphasized that the single data sheet containing Bryant's representations originally submitted to Smith by Kofoeb bore the catalog numbers 620S and 620P and Bryant's continued use of the catalog number after receipt of the catalog in its entirety can logically be viewed as a continued recognition on the part of Benco of the original data sheet and nothing more. Since the record does not indicate that Benco ordered any electrical products from Bryant other than the 620 lampholders, Benco never had an occasion to refer to the catalog after placing its initial November 11 order. This is not to say that two corporate parties are never free to alter or modify a continuing sales relationship after an initial transaction is conformed and completed. But there exists no convincing evidence to demonstrate that the parties intended to alter their original agreement—an agreement that did not restrict either party in the exercise of his rights.

Nothing in this holding appears to conflict with the Sixth Circuit's affirmance of this Court's decision in Country Clubs, Inc. v. Allis Chalmers Mfg. Co., 430 F.2d 1394 (6th Cir. 1970), or the more recent district court decision in Gates Rubber Co. v. USM Corporation, 351 F.Supp. 329 (S.D.Ill.1972), cited by defendant Bryant. In *Allis Chalmers*, this Court found effective a similar limitation provision where it was clear from the parties' "course of dealing" that they intended to incorporate such a provision into the sales agreement. However, in that instance the initial order form prepared by the seller contained, and the buyer expressed dissatisfaction with, the limitation provisions. In *Gates Rubber*, the district court, in interpreting Illinois law, expressly found that the warranty limitation provision, which the Court also construed to limit negligence liability,[11] formed an integral part of the sales agreement between the

10. This more recent order form contains the following conspicuous language at the bottom:

IMPORTANT: THIS ORDER IS ISSUED TO THE SELLER UNDER THE TERMS AND CONDITIONS AS STATED ABOVE, AND IN ALL CASES THE TERMS OF THE UNIFORM COMMERCIAL CODE WILL PREVAIL.

This language does not indicate that Benco waived or restricted its remedies in any respects, nor does it specifically incorporate Bryant's catalog as a term of the agreement.

11. Neither this Court nor the Circuit Court in *Allis Chalmers* passed on the question whether a warranty limitation, valid under the UCC, is equally effective to limit recovery under applicable tort law.

parties. Thus, in both cases, unlike the situation before the Court, the evidence clearly indicated that the parties intended to alter their respective rights.[12]

 With respect to the warranty and its limitations [13] between Benco and Cheker, Benco's attempt to limit Cheker's remedy to replacement must fail since there was no agreement that such would be an exclusive remedy (T.C.A. 47–2–719(1)(b)) and, additionally, it appears that under the circumstances any limited remedy failed of its essential purpose. Moore v. Howard Pontiac-American, Inc., 492 S.W.2d 227 (Tenn. App.1972).

### Statute of Limitations

In passing on the applicable period of limitations,[14] it is important to remember that plaintiff Benco filed its original complaint against Westinghouse Electric alone on June 29, 1973 and an amended complaint, which joined U.L. as a defendant, on December 10, 1973. In the former complaint, Benco claimed that only the new low profile (post 1969) 620S lampholder was defective, but in the latter amended complaint Benco claimed that both the new and the old 620S and 620P lampholders were defective.

 Plaintiff contends that, reduced to the essentials, its suit, unlike the traditional product liability case, is one for loss of good will which proximately resulted from defendant's misrepresentations concerning the quality and suitability of its lampholders. Thus, under plaintiff's reasoning the principal damage suffered was to its business and, accordingly, urges the Court to apply the ten-year statute of limitations. 28 Tenn.Code Ann. § 310. Alternatively, Benco relies upon the theories of misrepresentation, continuing tort, and fraudulent concealment to toll the three-year statute of limitations. 28 Tenn.Code Ann. § 305.

Tennessee's ten-year statute of limitations provides in full:

"Actions against guardians, executors, administrators, sheriffs, clerks, and other public officers on their bonds, actions on judgments and decrees of courts of record of this or any other state or government, and *all other cases not expressly provided for, shall be commenced within ten (10) years after the cause of action accrued.*" (Emphasis added)

It is conceded by plaintiff that if Section 310 does not control then 28 Tenn. Code Ann. § 305 does, which provides in pertinent part:

"Actions for injuries to personal or real property . . . shall be commenced within three (3) years from the accruing of the cause of action."

In urging the Court to apply the ten-year catch-all provision of Section 310, plaintiff places substantial emphasis on the Sixth Circuit's interpretation of that section in City of Atlanta v. Chattanooga Foundry and Pipe Works, 127 F. 23 (6th Cir. 1903), affirmed, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). There, Judge Lurton found

---

12. In this same vein, see generally Ford Motor Co. v. Taylor, 60 Tenn.App. 271, 446 S. W.2d 521, 532 (1969) (delivery of warranty after completed sale did not alter seller's obligation); Cooper Painting & Coatings, Inc. v. SCM Corporation, 457 S.W.2d 864, 867 (Tenn.App.1970) (disclaimer after sale ineffective).

13. Benco's warranty provides in pertinent part:
 All parts manufactured by Benco Plastics, Inc., are guaranteed against defect in materials and workmanship for a period of one year except as defined below.

\* \* \* \* \*

(3) Electrical Component—Benco Plastics passes on to customers all warranties provided by component suppliers, F.O.B. Knoxville, Tennessee . . . During the period of the guarantee, should any part prove defective, replacement of parts will be made F.O.B. Knoxville, Tennessee.

14. See generally, D. Noel & J. Phillips, Product's Liability in a Nutshell, at 320 (1974).

that a civil action for damages arising out of an illegal business combination fell within Section 4473 (predecessor of Section 310) since such an action did not flow from injury to personal property. Instead, Judge Lurton submitted that "[W]hile the precise question has not been decided by the Supreme Court of Tennessee, we do find an indisposition to give to the section [4470—three-year personal property] any such broad and indeterminate meaning as would include a suit *which does not involve any actual injury to property*." (127 F. at 31) (emphasis added) Likewise, Justice Holmes, in affirming the Court's decision, placed particular emphasis on the absence of an original injury to a particular physical object in concluding that Section 4470 governed the applicable period of limitations:

> "But there is a sufficiently clear distinction between injuries to property and 'injured in his business or property,' the latter being the language of the act of Congress. A man is injured in his property when his property is diminished. He would not be said to have suffered an injury to his property unless the harm fell upon some object more definite and less ideal than his total wealth."

Again, the absence of injury to personal property was emphasized in U.M.W. v. Meadow Creek Coal Co., 263 F.2d 52 (6th Cir. 1959), where the Sixth Circuit, quoting the language of Judge Lurton and Justice Holmes in *Chattanooga Foundry*, held the ten-year statute applicable to an action brought to recover for defendant's wrongful interference with plaintiff's business.

Thus, in both cases the common thread was that the *only* injury was to the business entity itself, and, in light of the unique nature of this injury, the personal property limitation provision of Section 305 was found inapplicable. Here, however, any injury to Benco's business was derived from an actual injury to personal property (defective sockets owned by Benco and defective sockets owned by third persons). Thus, unlike the cases cited by Benco, this is not a case where the injury fails to lend itself to a ready categorization within one of Tennessee's conventional statutes of limitation.

While economic injury to a business entity may inevitably follow a preceding property injury to a third party, to summarily hold Section 310 applicable in such an action would render Section 305 ineffective and meaningless. To further enlarge the scope of Section 310 beyond the limited boundaries set by the *Chattanooga Foundry* and *UMW* cases to include the situation at bar is beyond the prerogative of this Court. We do not read those cases to require such a construction. Of course, this is not to say that Benco is precluded from recovering business losses that followed as a result of property damage suffered within the three-year period of Section 305.

■■ The Court has further examined the applicable case law and concludes that Benco's action under Section 305 has not been tolled under the facts of this case. It is equally apparent that while Tennessee has adopted by statute the time-of-injury as the yardstick for calculating the accrual of a personal injury action in a product-related injury,[15] the date-of-sale still prevails as the focal point in personal property actions:[16]

Plaintiff's contention that the three-year statute should be tolled in this instance finds no support in the Tennessee case law. Although the Court recognizes that an unintentional misrepresentation has been held to toll a limitation period

15. 28 Tenn.Code Ann. § 304 (Supp.1973).

16. Hackworth v. Ralston Purina, 214 Tenn. 506, 381 S.W.2d 292 (1963). More recently this position was affirmed in Moulton v. Ford Motor Co., Tenn. Court Appeals, May 25, 1973, affirmed in part, reversed in part, Tenn.Sup.Ct., March 18, 1974. ("[S]uch claims for property damage to plaintiff . . . would run three years from the date of sale under T.C.A. 28–305") (Slip opinion at 9).

under the Federal Employees Liability Act in an employer-employee relationship,[17] it would be questionable at the very least for a federal court sitting in its diversity capacity to transpose this same principle to the commercial arena without more definitive direction from the Tennessee courts. Indeed, the policy considerations underlying the tolling of a FELA statute for misrepresentation by an employer are not present here. In this same vein, it has not been demonstrated that the continuing tort and fraudulent concealment rules have been extended beyond their limited personal injury [18] application in the doctor-patient and employer-employee relationships. Moreover, even in those jurisdictions that have adopted the continuing tort rule in the product liability area, its application has been restricted generally to personal injury cases.[19]

■ Remaining before the Court in delineating the period of limitations is the contention made by defendant that the amended complaint filed by Benco on December 10, 1973, does not relate back to the date of filing of the original complaint. Rule 15(c) generally governs the relation back of an amendment:

"(c) Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading rose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

The essence of this rule and its construction was set forth in United States v. Templeton, 199 F.Supp. 179, 183 (E.D.Tenn.1961), where the Court stated:

"Regardless of what the rule may be in other jurisdictions, the rule to be followed in federal courts is that if there is an identity between the amendment and the original complaint with regard to the general wrong suffered and with regard to the general conduct causing such wrong, then the amendment shall relate back and the statute of limitations would not avail to preclude a hearing on the merits."

It is noted that the amended complaint essentially involved the same underlying circumstances and injury asserted in the original complaint. Defendant Bryant had full knowledge since June of 1973 that Benco's complaint was directed at defective lampholders and the mere amplification alone in the amended complaint to include the old 620 lampholders provides no justification for disallowing its relation back. Thus, the general wrong suffered and the conduct causing such wrong are sufficiently identical. In this regard, defendant's objection is a technical one and the paramount question is whether the allowance of relation back would work an injustice on the parties. This the Court cannot answer in the affirmative since it is not even apparent that

17. Louisville & Nashville R.R. v. Disspain, 275 F.2d 27 (6th Cir. 1960); Tillery v. Southern Railway, 348 F.Supp. 9 (D.C.Tenn. 1971).

18. Osborne v. Hartford Accident and Indemnity Co., 63 Tenn.App. 518, 476 S.W.2d 256; Frazor v. Osborne, 57 Tenn.App. 10, 414 S. W.2d 118 (1966). When Tennessee first borrowed the continuing tort theory from the employer-employee relationship, the courts placed significant emphasis on the professional relationship and trust existing between the doctor and patient. 414 S.W.2d at 133. See Union Carbide & Carbon Corp. v. Stapelton, 237 F.2d 229 (6th Cir. 1956); Ray v. Schiebert, Tenn.App., 484 S.W.2d 63 (Tenn.App.1972). See also, similarly non-analogous relationships Tennessee Eastman v. Newman, 22 Tenn.App. 270, 121 S.W.2d 130 (1938) (employer-employee); Ferguson v. Moore, 98 Tenn. 342, 39 S.W. 341 (1897) (plaintiff-seducer).

19. See, e. g., Handler v. Remington Arms Co., 144 Conn. 316, 130 A.2d 793 (1957). Likewise, plaintiff's similar theory of a continuing failure to warn has been limited to those instances where the product causes some personal injury to an ultimate consumer. Tyler v. R.R. Street & Co., Inc., 322 F.Supp. 541 (E.D.Va.1971) (emission of fumes-personal injury); Boains v. Lasar Mfg. Co., 330 F.Supp. 1134 (D.Conn.1971) (meatgrinder-personal injury); Bordonaro v. Westinghouse Elec. Corp., 287 F.2d 954 (2d Cir. 1961) (heating machine-wrongful death).

the defendant Westinghouse will be harmed by allowing the amended complaint to relate back. The amended complaint alleged that the pre-1969 or old lampholders were defective as well as the new low profile lampholders. Since Benco's action accrued on the date of sale, Benco would not recover for any allegedly defective old lampholders unless the same were purchased since June 29, 1970. It is the Court's construction of the evidence that only new 620 lampholders were purchased during this period.

In light of the dismissal of U.L., it is not necessary to calculate an accrual on the claim against them.

As between Benco and Cheker Oil Company, it appears that the four year statute would apply. (47 Tenn. Code Ann. 2–725) The Court is of the further opinion that this statute was not tolled under the future performance provision of that section. Indeed, Mr. Small of Cheker testified that "from the very beginning of the 1968 order" they experienced trouble with the Benco signs. The warranties extended to Cheker were not prospective in nature but merely set forth the present condition of the goods at the time of sale.

To summarize, assuming it is shown by Benco that defective lampholders in fact caused the alleged injury, it may recover damages for these lampholders purchased from June 29, 1970.

### Misrepresentation

Plaintiff Benco's claim for misrepresentation is founded principally on Sections 402B and 552D of the Restatement of Torts, 2d, as recognized and articulated under the Tennessee case law.[20] Defendant Bryant claims that Sections 402B and 552D have no application under the present posture of this case since those sections are directed only to the ultimate consumer and not to the intermediate assembler. Bryant further claims that the above sections are not controlling since there were no *public* misrepresentations.

Section 402B of the Restatement provides in full:

"§ 402B *Misrepresentation by seller of Chattels to Consumer*

"One engaged in the business of selling chattels who, by advertising, labels or otherwise, makes to the public a misrepresentation of material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

"(a) it is not made fraudulently or negligently, and

"(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

Section 552D reads as follows:

"One engaged in the business of selling chattels who by advertising, labels or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for pecuniary loss caused to another by his purchase of the chattel in justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently."

In determining whether this is an appropriate case to apply the above sections, it is important to place defendant Bryant's misrepresentation in the context of the alleged injury suffered by Benco. In this regard, Benco claims that as a result of Bryant's misrepresentations it presently owns and has sold defective signs to customers, who in turn expect, or will in the future expect, Benco to reimburse them for necessary

20. Ford Motor Co. v. Lonon, 217 Tenn. 400, 398 S.W.2d 240 (1966); Cooper Painting & Coatings v. SCM Corp., Tenn.App., 457 S. W.2d 864 (1970); Walker v. Decora, 471 S. W.2d 778 (Tenn.1971); Jasper Aviation v. McCullum Aviation, Inc., 497 S.W.2d 240 (Tenn.1972).

alterations or repairs to their signs in the field. In addition to these expenses, Benco claims that Bryant's misrepresentation, and the resulting defective signs, caused loss of profits to their business because of customer dissatisfaction or loss of good will. Thus, Benco essentially claims that Bryant's misrepresentations have resulted in an economic injury.

■ Initially, Bryant's contention that applicable principles of strict liability [21] are preempted by the Uniform Commercial Code must fail. Chapters 1–9 of the Uniform Commercial Code are prefaced by Section 47–1–103, which provides in applicable part:

"Unless displaced by the particular provisions of chapters 1 through 9 of this title, the principles of law and equity, including the law merchant and the law relative to . . . misrepresentation . . . shall supplement its provisions."

This supplementary section was recently recognized in Moore v. Howard Pontiac-American, 492 S.W.2d 227, 230 (Tenn. App.1972), to effect an offset for use of an automobile by the buyer.

■ Plaintiff's argument for application of Section 552D under the facts of this case finds its strongest support in the factually analogous case of Cooper Painting & Coatings, Inc. v. SCM Corp., 457 S.W.2d 864 (Tenn.App.1970). In that case, plaintiff, a corporate subcontractor, applied defendant's roofing material to a third party's roof and, shortly after application of the material, leaks developed. Plaintiff, under an obligation to repair the roof, applied another manufacturer's product. Thus, like Benco, plaintiff did not suffer the immediate property damage since its completed product was in the hands of a third party at the time the defect developed but did suffer a monetary injury since it was under an obligation to repair its own defective product. The Court of Appeals explicitly held recovery was allowable under Section 552D. Quoting Section 552D, the Court stated:

"In Ford Motor Company v. Lonon, supra, our Supreme Court approved the proposed Sec. 552D of the Restatement of Torts (Second) which permits recovery by the purchaser for pecuniary loss of a defective product when there is no privity." 457 S.W.2d at 867.

Any distinction drawn between the *Cooper Painting* case and this case would not appear to be functionally dispositive. Thus, in both cases: (1) the plaintiff, a corporation, used defendant's product in rendering a completed service or manufacturing a finished product; and (2) incurred a pecuniary loss because of a material misrepresentation. We need not go any further than to note that Tennessee has applied Section 552D under a sufficiently comparable situation.[22]

The assertion by Bryant that Benco was under no obligation to repair the burned out signs is misplaced. Any validity in Benco's limitation provision (replacement of defective parts) is vitiated by the fact that, under the facts of this case, such a remedy was not exclusive and, additionally, would have proven ineffective and therefore failed of its essential purpose. Under such circumstances, a purchaser of Benco's signs would have been free to invoke available statutory remedies. 47 Tenn. Code Ann. § 2–719(1)(a), (2)(3); Moore v. Howard-Pontiac American, Inc., 492 S.W.2d 227 (Tenn.App.1972). Under these circumstances, Benco was under and continues under an obligation to repair its customers' signs where it is shown that such signs malfunctioned.

21. It is not clear whether Bryant considers misrepresentation under 552D to be tantamount to strict liability.

22. The Court goes no further than to hold that Tennessee has applied Section 552D to govern a commercial relationship. This is not to say that Tennessee would apply the Restatement in its entirety to govern commercial relationships.

Finally, it should be noted that foreseeability has traditionally served as the principal criterion in determining whether a plaintiff's injury is compensable, and, under any construction of the events in this case, it is readily apparent that the economic injury to Benco was sufficiently foreseeable to fall within the scope of this rule.[23] Thus, in the opinion of the Court Section 552D is applicable to govern the issue of liability for Bryant's misrepresentation.[24] Bryant's response that under the language of 552D there was no requisite *public* misrepresentation is similarly misplaced. The excerpt from Bryant's catalog, submitted to Benco in 1966, although describing the old lampholders, was sufficiently public and was incorporated into the representations made in 1969–1972 concerning the continuing suitability of the low profile 620 lampholder. In any event, an examination of the Tennessee caselaw invoking Section 552D indicates that the Courts in this state do not attach particular importance to the scope of defendant's representations.[25]

■■■ The Court is not persuaded that under the facts of this case Underwriters' Laboratories should be held liable. While Sections 311A and 324A of the Restatement, 2d, respectively, were applied to hold an endorser liable in Hanberry v. Hearst Corp., 276 Cal.App. 2d 680, 81 Cal.Rptr. 519 (1969) and Hempstead v. General Fire Extinguisher Corp., 269 F.Supp. 109 (D.Del.1967), in both cases application of the Restatement was far more restricted. Construing plaintiff's case in a most favorable light, it cannot be said that Tennessee under these circumstances would broaden the scope of those cases and hold Underwriters' liable. In both of the above

cases there was a physical injury to an ultimate consumer. Moreover, the Court is not convinced that the policy considerations underlying the imposition of tort liability dictate such a finding here. These policy considerations are:[26] (1) the degree of closeness between the injured party and the endorser; (2) the nature of plaintiff's injury; (3) the causal connection between plaintiff's injury and the endorser's representation; (4) the evidence of reliance on the endorser's representations; (5) the moral culpability attached to the endorser's conduct; (6) the policy of preventing future harm; and (7) the nature of the endorser's business. Thus, in finding Underwriters' Laboratories not liable under the limited facts of this case, the Court receives more guidance from practical policy considerations than whether such a claim against an endorser conveniently fits within a legal nitch.[27] Most importantly, there is no indication that plaintiff Benco will be prejudiced in dismissing Underwriters' Laboratories. Likewise, Benco's third party complaint against U.L. is dismissed.

■■■ In examining Cheker's claim against Benco, the Court is of the opinion that Benco breached both its express and implied warranties owing to Cheker and Cheker may recover from Benco for both direct and consequential losses. Whether Benco may recover under indemnification over as against Bryant depends upon its ability to prove that the cause of Cheker's injury was Bryant's defective lampholder.

### Causation

Regardless of the legal issues discussed above, the controlling issue in this action is one of fact—whether the misrepresentation by Bryant that its

---

23. D. Noel & J. Phillips, Products Liability in a Nutshell, at 203 (1974); *James*, Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal, 25 Vand.L.Rev. 43–45 (1972).

24. Cf. Randy Knitwear Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962).

25. See note 17, supra.

26. Biakanja v. Irving, 49 Cal.2d 647, 650, 320 P.2d 16, 19 (1958).

27. 81 Cal.Rptr. at 520. See generally 39 A. L.R.3d 181 (1971)

lampholder was suitable for outdoor use was the cause of Benco's injury. As initially noted, Benco claims that the collective effect of numerous defects rendered the lampholders unsuitable for outdoor use. That is to say, it is the defective lampholder that caused the burnouts. Bryant responds that the leakage of rainwater into the signs caused the burnouts.

While Benco's amended complaint seeks to recover for defective old 620S and P lampholders and while counsel for both sides submitted that the old pre-1969 as well as the low profile post-1969 experienced burnouts,[28] a thorough search of the record indicates that no lampholder complaints other than Cheker complaints were made to Benco by its customers until sometime in 1971 and the record further indicates that these complaints concerned the low profile 620S. Although Cheker evidently experienced some difficulty with Benco signs prior to 1969, it is not entirely clear that this trouble was in fact attributable to the lampholders. Thus, excepting the Cheker testimony, there is no indication that Benco experienced any trouble with the old 620 lampholders. Because this is an important point, it is worth repeating the following testimony:

### I. Smith—Cross-Examination

"THE COURT: Does your former company claim damages against these people for anything that happened between 1966 and 1969?

"A: Not to my knowledge, no sir.

"Q: And you had no complaints through 1969, did you?

"A: No, sir." (Transcript at 48)

### II. Duncan—Direct

"Q: What kind of experience did you have with these lampholders?

"A: In the beginning we thought they [620S-low profile] were the answer to our prayer so to speak. The designer in particular liked them.

Later on, we began to have problems with them burning out . . .

"THE COURT: When later on?

"A: Well, it took us a while to get the signs out in the field, probably later '71 was when I first heard about it.

"Q: That is when you first heard about it?

"A: Sometime in '71." (Transcript at 91)

### III. Foley—Cross

"Q: You stated that in 1971 Ron Smith mentioned to you that they had a complaint about burn ups of the lampholders.

"A: Yes, sir." (Transcript at 156)

### IV. Frazier–Direct

"Q: Have you ever had a lampholder failure in all those years in your outdoor plastic lines?

"A: Yes, sir, we've had some recently.

"Q: And when was the first one?

"A: The first time I knew about it was November of '73." (Transcript at 21)

### V. Small—Direct

"Q: Coming now to 1973, do you recall when the problem was first pinpointed to you as being one with a socket and not with moisture or ballasts or the other things?

"A: This was pinpointed to me on a visit in early '73. . . ." (Transcript at 249)

### VI. Wilks—Direct

"Q: When did you first become aware of a problem involving the Bryant socket?

"A: It was in April of '73." (Transcript at 311)

### VII. Teed—Direct

"Q: When was the first time you heard about a complaint from Benco?

---

28. Transcript at 198.

"A: In January, 1973." (Transcript at 547)

In the absence of any evidence as to which lampholders were defective, the Court can only conclude that the low profile post-1969 620S was the only defective lampholder. The record is barren of any evidence tending to indicate that the old 620 lampholders were defective.

Focusing on the expert proof of both parties, it is the opinion of the Court that the burnouts resulted from three probable causes:

(1) The defective condition of the low profile 620S lampholder.

(2) The defective construction of signs by Benco, permitting rainwater to enter the sign's interior and ultimately flooding the raceway and lampholders.

(3) The alteration of the signs in the field by a third party, exposing the interior to rainwater. This alteration may have occurred in the process of erection, maintenance or vandalism.

If it is shown in the proof on damages that a given injury or liability can be attributed to the first cause then Benco can recover from Bryant for that injury. If, however, a given injury resulted from the latter two causes then Benco would have to absorb the entire loss proximately resulting from that cause.

The primary difficulty that faces the Court in adopting Benco's theory of causation in its entirety lies in the conflicting nature of that multi-faceted theory. Simply put, plaintiff argues that the inadequate spacing in the low profile 620S lampholder, alone, did not cause the arcing, but instead insists that spacing in conjunction with other defects caused the burnouts. Thus, inadequate spacing, the presence of zinc chloride acting as an electrolyte in the presence of condensate, the electrical deterioration of wood filler phenolic, cracking of the phenolic, and presence of voids jointly caused the arcing and ultimate burning. In support of plaintiff's thesis was the testimony and experiments of Geiger, an electrical engineer; Yoakum, a chemical engineer; and Javkin, a chemical engineer-plastics.

Doctor Geiger testified that as a result of his observations and experiment, the lampholders were defective because of inadequate spacing, the presence of a foreign material acting as an electrolyte in the presence of moisture, the use of wood filler phenolic as a plastic base, and the rusting of the zinc bezel.[29] Dr. Geiger ran two experiments: In the one experiment he placed lampholders in a humidity chamber for three to four weeks and energized (applied voltage to) them at a relative humidity of 95%. The lampholders did not fail. In a second experiment performed by Geiger, energized lampholders were sprayed with water that had been used to soak lampholders. Thus, the spray mist, similar in structure to condensate, would have contained any soluble electrolytes that might have been present on Bryant's lampholders and which would have acted as an electrical conductor between live and grounded electrical parts. In this experiment, the lampholders burned out. When sprayed in a similar fashion with nonionized water (pure water), the lampholders did not arc. Benco points to the presence of the electrolyte on Bryant's sockets as the foreign substance contributing to the burnouts. Unfortunately, the validity of this experiment is reduced by the fact that the lampholders used to make the soaking solution had been stored outside for six to twelve months prior to the experiment where they could easily have been contaminated.

Doctor Yoakum through chemical analysis isolated the electrolyte on Bryant's sockets as zinc chloride and also stated that in her opinion the bezel's sacrificial zinc coating was inadequate to prevent rusting. Under Dr. Yoakum's theory, when a small amount

---

29. With respect to the rusting of the bezel, plaintiff failed to show any causal connection between this alleged defect and the burnout problem.

of water in the form of condensate was mixed with the zinc chloride an electrical conductor was formed which in turn facilitated arcing. However, she further explained that if a larger amount of water than that produced by condensate alone came in contact with the lampholder the electrolyte would probably be washed away.

Doctor Javkin stated that as a result of his observations and experiments he felt that wood filler phenolic was not suitable for use in an enclosed outdoor sign since, due to the properties of wood filler phenolic, the plastic base over a period of time would degrade electrically. This deterioration results from the tendency of the wood filler to absorb moisture from the air. Dr. Javkin ran three experiments in which he placed Bryant and competitive lampholders in plastic containers and subjected them to varying degrees of humidity and temperature. Thus, unlike the humidity experiments run by Geiger and Bryant, the lampholders were exposed to varying extremes of field temperatures and humidity before being energized. In this instance, the Bryant lampholders failed but the competitive lampholders did not.

The disconcerting feature of Dr. Javkin's experiment is the failure of the lampholders that had the "old" spacing, .390 inch rather than .196 inch as in the low profile lampholder. The old spacing appears to be in compliance with the U. L. standards. Thus, even where the live to ground spacing was in compliance with the U.L. standards, the lampholders failed. Yet there appears to be no evidence that the lampholders failed until the introduction of the new lampholder in 1969. It is this absence of failure of lampholders from 1966 to 1969 that disturbs the Court. In this regard, if Bryant lampholders were in fact unsuitable for outdoor use because of the presence of an electrolyte, cracking and wood filler phenolic (and not inadequate spacing alone), it would appear that arcing and burnouts would have occurred long before 1971 since the presence of an electrolyte and condensate alone would

have caused arcing, regardless of the spacing between live and ground electrical parts. Thus, all the defects, except spacing, could have caused arcing before 1969 but the record evidences that no complaints were specifically attributed to the lampholders until 1971.

The Court is equally disturbed by the introduction of photographs by both Benco and Bryant showing in certain instances alteration of the signs in the field by a third party. Such tampering would clearly operate as an intervening cause, unforeseeable by Bryant.

Bryant introduced expert testimony from Dr. Wiley, an electrical engineer with Bryant, who developed the low profile 620S; Dr. Gainer, a chemist with Westinghouse; and Dr. Mattin, an independent electrical engineer. In a nutshell, their testimony and experiments tended to indicate that while condensate would not cause lampholder failure, water would cause burnouts. More specifically, their experiments indicated that certain Benco signs in fact leaked water and that when this water entered the sign's interior, the lampholders failed. More important, however, than Bryant's experiments is the persuasive evidence of rust at the bottom of Benco's signs in the field. Such rust evidences to the Court that rainwater was permitted to enter Benco's signs and sit in the proximity of the raceway. In certain instances, evidence shows that water entered the raceway.

The Court cannot turn its back to the fact that Benco vigorously insists that the *sole* cause of the burnouts was condensate and not the leakage of rainwater into the lampholder. The Court is of the opinion, however, that with the advent of the low profile 620S lampholder and the reduction in its electrical spacing between live and grounded parts that this reduction served in certain instances as the triggering catalyst in promoting arcing. Thus, while the other defects such as an electrolyte on the lampholder's surface, cracking of the phenolic base and use of wood filler phenolic, alone, would not have caused arc-

ing before 1969, when the spacing was reduced in 1969, this spacing triggered the other latent defects. Thus in reducing the spacing below the minimal acceptable U.L. standards, Bryant's low profile 620S lampholder was rendered unsuitable for outdoor use despite Bryant's representations that it was in fact suitable for outdoor use. The Court therefore concludes that in some limited instances, the low profile 620S caused the burnouts because of the enumerated defects. However, the Court is equally of the opinion that due to the evidence of alteration and misuse and the presence of rust in Benco's signs in some instances burnouts resulted from rainwater flooding the sign's interior. This evidence of defective signs goes a long way to temper the inflated claims of damage on the part of Benco.

It is the delegated prerogative of Judge Bare to determine the amount of damages which was solely caused by the defendant Bryant.

Nothing said herein is intended to give rise to a presumption or an inference that the proximate cause of a claimed damage was due to the fault of either party and in proving that a given injury was proximately caused by defendant the evidence must preponderate in plaintiff's favor.

### Damages

Judge Bare, the person agreed upon by all parties to determine damages, if any, will follow the guidelines set forth below:

Before recovery can be granted against Bryant in the favor of Benco, Benco must prove that any given injury or claim of damage, indemnification or contribution is proximately related to a defective socket manufactured by Bryant. If it is determined that rainwater in fact caused the damage, then no recovery is to be allowed as between Benco and Bryant.

Loss of profits and good will are recoverable as between Benco and Bryant but only in the event that Benco shows that such injury proximately resulted from defective lampholders and not defective signs. Ford Motor Co. v. Lonon, 398 S.W.2d 240 (Tenn.1966). Loss of good will and profits cannot be recovered if shown to be attributable to mismanagement or production of defective signs.

Because it appears that Bryant was under a duty to repair those defective (burned-out signs) in the field, Benco can recover from Bryant for repairs made in the past, either by Benco or a third party, where such repairs can be shown to be attributed to defective lampholders and not defective signs.

With respect to the Bryant sockets in Benco's present sign inventory, Benco may recover for the difference in the value of the lampholders with and without the defect caused by Bryant. The Court feels this is an allowable cost because the defective sockets are an immediate injury to Benco. However, with regard to those Benco signs in the field and owned by customers, Benco may not recover for the cost of replacing these lampholders since an injury to Benco has not occurred until a claim is made and established against Benco for an injury caused by the defective sockets.

Cheker Oil Company may recover from Benco for necessary repairs made to defective signs it purchased from Benco. In the event a final judgment is rendered against Benco for Cheker claims, any indemnification or contribution would be carried over to Bryant if it is shown that Cheker's claim or claims were caused by defendant.

Before the trial and during the trial, the Court was of the opinion that U.L. would be liable for any damage resulting from its endorsement and consequent misrepresentations. Upon an examination of authority, however, the Court has determined since the trial that U.L. is not liable under the facts and circumstances of this case.

In accordance with the agreement of all parties, as previously indicated, the case is referred to Judge Bare to report to the Court at the earliest practicable date after taking evidence in accordance with the foregoing findings of fact and conclusions of law.