**UNITED STATES LIGHTING SERVICE INC., Plaintiff,**

v.

**The LLERRAD CORPORATION, dba Fluor–Tech, et al., Defendants.**

No. C89–315.

United States District Court,
N.D. Ohio, E.D.

Aug. 3, 1990.

---

Danny R. Williams, Schneider, Smeltz, Huston & Ranney, Cleveland, Ohio, for plaintiff.

Eugene B. Meador, Kitchen, Messner & Deery, Hugh M. Stanley, Jr., Dale F. Kainski, Arter & Hadden, Cleveland, Ohio, Michael Zazzara, Northbrook, Ill., for defendants.

## MEMORANDUM AND ORDER

BATTISTI, District Judge.

Before discovery sheds more light on this alleged malfunctioning product, two pending motions must be addressed. In this diversity action, Defendant Llerrad Corporation ("Llerrad") has filed, pursuant to Fed.R.Civ.P. 12(b)(2), a Motion to Dismiss for lack of personal jurisdiction. Defendant Underwriters Laboratory ("Underwriters") has separately filed a Motion to Dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Plaintiff U.S. Lighting Service, Inc. ("U.S. Lighting") has opposed both motions. For the reasons that follow, both Motions must be DENIED.

U.S. Lighting, an Ohio corporation, services lighting fixtures in commercial establishments. In May, 1987, U.S. Lighting purchased, from Llerrad, 7,000 Fluor–Tech Energy Savers for Fluorescent Lighting ("Energy Savers") at a cost of over $50,-000. Under U.S. Lighting's requested delivery schedule, the Energy Savers were to be shipped by Llerrad, in specified numbers and dates, directly to the premises of U.S. Lighting's customers. *See* Amended Complaint, ¶ 10; U.S. Lighting Brief in Opposition to Motion to Dismiss, Exh. D. Llerrad, a California corporation, conducts business under the name "Fluor–Tech." Llerrad published and distributed advertisements which expressly warranted and represented that the Energy Savers were:

(a) designed and intended to work with rapid start and instant start fluorescent lighting fixtures including High Output (800 milliampere) fluorescent fixtures;

(b) rigorously tested, superior in manufacture, and incorporating the highest quality components and engineering experience; and

(c) safety-tested and approved by Underwriters Laboratories, Inc., as evidenced by the "UL" mark.

Amended Complaint ¶ 9. Shortly after their purchase and installation, a "significant number of the Energy Savers began to burn, melt or otherwise malfunction during operation, resulting in damage to lighting fixtures, the scorching of surrounding materials and the exposure of bare electrical wires." *Id.*, at ¶ 11. The heat caused by the malfunction created an additional, substantial and unreasonable risk of electrical fires or serious injury to unprotected personnel. U.S. Lighting further alleges that it notified Llerrad of the serious nature of the Energy Savers malfunctions, the failure to conform of these Energy Savers to Llerrad's express warranties and representations, as well as implied warranties, and the danger the condition posed to persons and property. Llerrad offered to replace specific malfunctioning Energy Savers with identical products. Meanwhile, U.S. Lighting's customers demanded that U.S. Lighting remove the Energy Savers; at its own expense, U.S. Lighting removed all of them. *Id.*, ¶¶ 11–13.

Underwriters, it is alleged, is in the business of testing samples of electrical equipment and appliances to determine whether the products are safe and reliable according to Underwriters. Only those products which pass Underwriter's testing proce-

dures are authorized by Underwriters to bear the registered "UL" mark—akin to a Good Housekeeping Seal. *Id.*, ¶¶ 22–23. In the ordinary course of business, Underwriters undertook to test samples of the Energy Savers for safety and fitness; for its services in conducting testing, U.S. Lighting believes it was paid a fee. Underwriters knew that its testing and any affirmations of safety would be used by Llerrad, and relied upon by purchasers of Energy Savers, such as U.S. Lighting. Underwriters is alleged to have negligently inspected, tested, and published inaccurate information regarding the Energy Savers. It also, *inter alia,* failed to discover or communicate defects, adequately test the Energy Savers or restrict the use of its "UL" approval mark, and take other reasonable precautionary steps. *Id.*, ¶¶ 28–29.

### A. Subject Matter Jurisdiction

As the party with the burden of affirmatively establishing subject matter jurisdiction—*McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936), U.S. Lighting has properly pleaded and established diversity of citizenship under 28 U.S.C. § 1332: U.S. Lighting is an Ohio corporation with its principal place of business in Willoughby, Ohio; Llerrad is a California corporation with its principal place of business in Carson, California; Defendant Underwriters is a Delaware not-for-profit corporation [1] with its principal place of business in Northbrook Illinois. There is the requisite amount in controversy.[2]

### B. Motion to Dismiss under Rule 12(b)(2)

Personal jurisdiction, unlike subject matter jurisdiction may be waived; however, once personal jurisdiction is challenged, the burden of affirmatively establishing its existence lies on the party invoking federal jurisdiction. *McNutt, supra,* at 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Weller v. Cromwell Oil Co.,* 504 F.2d 927 (6th Cir.1974). Although a trial court has discretion to determine how to resolve a 12(b)(2) motion, the case law of this Circuit clearly "establishes a settled procedural scheme to guide trial courts in the exercise of this discretion." *Serras v. First Tennessee Bank National Association,* 875 F.2d 1212, 1214 (6th Cir.1989) (Merritt, J.). Since full discovery has not taken place, and this motion is decided on written submissions alone, pursuant to Local Civil Rule 3.01, the weight of Plaintiffs' burden is "merely that of making a *prima facie* showing that personal jurisdiction exists." *Id.* As Chief Judge Merritt summarized:

If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, "by affidavit or otherwise[,] ... specific facts showing that the court has jurisdiction." [*Weller v. Cromwell Oil Co.,* 504 F.2d] at 930. When the trial court has determined that the motion to dismiss for lack of personal jurisdiction can be decided upon these written submissions, it "must consider the pleadings and affidavits **in the light most favorable to the plaintiff.**" *Welsh v. Gibbs,* 631 F.2d 436, 439 (6th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981) (quoting *Poston v. American President Lines, Ltd.,* 452 F.Supp. 568, 571 (S.D.Fla.1978)).... If she meets [the *prima facie* ] burden the motion to dismiss should be denied, "notwithstanding any controverting presentation by the moving party." *Marine Midland Bank* [*v. Miller*], 664 F.2d [899]

---

1. Although the Amended Complaint states that Underwriters is a Delaware corporation, and Underwriters, in its Answer, denies this allegation and pleads that it is a "not-for-profit" corporation, for diversity purposes, this distinction is a red herring—a corporation is a corporation is a corporation.

2. Although the amount is pleaded in the Complaint and Amended Complaint as over $10,000, this case was filed before May 19, 1989, when the $50,000 jurisdictional amount took effect. Since subject matter jurisdiction was proper, and vested at the time of filing the Complaint, there is no need, in this case, to plead a higher

at 904 [2d Cir.1981].[3]

*Serras,* 875 F.2d at 1214.

In diversity cases, it is settled that the assertion of personal jurisdiction must comport with both the state long-arm statute and the Due Process Clause of the United States Constitution. Fed.R.Civ.P. 4(e); U.S. Const.Amend. 5, 14; *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Plaintiff relies upon one provision of the Ohio long-arm statute, Ohio Rev.Code Ann. § 2307.382,[4] which provides in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts **directly or by an agent,** as to a cause of action arising from the person's:

(1) **Transacting any business in this state;**[5] * * * *

(C) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

The Sixth Circuit has repeatedly interpreted the "transacting any business" provision of the Ohio long-arm statute, as extending to the outer limits under the Due Process Clause. *See Creech v. Roberts,* 908 F.2d 75, 79 (6th Cir.1990); *American Greetings Corp. v. Cohn,* 839 F.2d 1164 (6th Cir.1988) *R.I. Lipton Distributing Co. v. Dribeck Importers, Inc.,* 811 F.2d 967, 969 (6th Cir.1987) *In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 225 (6th Cir.1972).[6] Thus, "an Ohio personal jurisdictional analysis becomes an examination of constitutional limitations." *American Greetings,* 839 F.2d at 1167 (quoting *Lipton,* 811 F.2d at 969). The fundamental inquiry will be whether each Defendant has "minimum contacts" with the forum state [Ohio] and whether the exercise of jurisdiction offends "traditional notions of fair play and substantial justice." *Interna-*

---

amount in controversy in the Amended Complaint.

**3.** As *Serras* explained, before meaningful discovery has taken place, and the parties have a chance to gather evidence or proof from the opposing party, trial courts do not engage in trial by affidavit:

> The court's solicitude for defendants who object to its personal jurisdiction is always tempered, however, by its concern that the door to a federal courtroom not be slammed in the face of a plaintiff seeking to invoke its powers where there is, in fact, no defect in personal jurisdiction. Particularly where disputed jurisdictional facts are intimately intertwined with the parties' dispute on the merits, a trial court should not require plaintiffs to mount "proof which would, in effect, establish the validity of their claims and their right to the relief sought." *Milligan v. Anderson,* 522 F.2d 1202, 1207 (10th Cir.1975); *U.S. v. Montreal Trust Co.,* 358 F.2d 239, 242.

*Serras,* 875 F.2d at 1215.

*Serras* further noted two additional reasons for not resolving, at this stage, conflicting affidavits. First, judicial resources may be more efficiently employed if there is one, not several evidentiary hearings on disputed jurisdictional facts. Second, by postponing proof until trial—when discovery has been completed—allows the plaintiff to present the proof "in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." *Serras,* at 1215 (quoting *Data Disc Inc. v. Systems Technology*

*Associates, Inc.,* 557 F.2d 1280, 1285–86 n. 2 (9th Cir.1977")).

**4.** In Ohio, there apparently remains an unresolved question whether the long-arm statute, § 2307.382, the comparable Civil Rule 4.3(A)(3), or both govern personal jurisdiction jurisprudence. See, *e.g., Giachetti v. Holmes,* 14 Ohio App.3d 306, 471 N.E.2d 165, 167 n. 1 (1984) (Markus, J.) (Noting presumed conflict under Section 5, Art. IV of the Ohio Constitution); 22 *Ohio Jurisprudence 3d,* Courts and Judges § 277 at 416 (1980). Although both the rule and statute were amended in 1988, the Ohio Supreme Court, in *Fallang v. Hickey,* 40 Ohio St.3d 106, 532 N.E.2d 117 (1988), analyzed Civ.R. 4.3(A)(3). However, the federal courts have relied upon the statute—*see Creech v. Roberts,* 908 F.2d 75 (6th Cir.1990); *American Greetings Corp. v. Cohn,* 839 F.2d 1164 (6th Cir.1988). Because the pertinent provisions of the statute and rule are identical, the analysis for the case *sub judice* is the same.

**5.** The next section of the long-arm statute, § 2307.382(A)(2) reads: "Contracting to supply goods or services **within the State.**" Because U.S. Lighting has not argued that this provision should be a basis for long-arm jurisdiction, this memorandum opinion addresses only the "transacting any business" argument.

**6.** This Court assumes, as the precedent in this Circuit has, that the "transacting any business" inquiry is equivalent to a constitutional due process inquiry.

*tional Shoe Co. v. Washington,* 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 101 (1945).

In the Sixth Circuit, there are three criteria that must be met to comport with due process:

> First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the foreign state. Second, the cause of action must arise from the defendants' activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1299 (6th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990) (citing *Southern Machine Co. v. Mohasco Industries,* 401 F.2d 374, 381 (6th Cir.1968) (Celebrezze, J.)).

Llerrad argues, essentially, that it did not transact enough business in Ohio; Darrell Masters, Llerrad's President, states that Llerrad lacks presence in this state (no employees, agents, representatives, offices, property, etc.). Masters Aff. ¶¶ 1–6. Although Llerrad states that on May 20, 1987, it agreed to sell "energy savers" to U.S. Lighting, these energy savers were not "sold, shipped or otherwise delivered to any locations in [Ohio]." *Id.,* ¶¶ 7–8. Llerrad also argues that it "does not engage in any "direct mail solicitations to persons in Ohio." *Id.,* ¶ 9.[7]

In response to the Motion to Dismiss and the Masters Affidavit, U.S. Lighting has produced an Affidavit from its President, Michael Monin and numerous Exhibits (correspondence, invoices, and a brochure) in order to meet its *prima facie* burden. Monin states that in 1984, Masters, then President of Llerrad, contacted him to purchase Energy Savers for installation at various U.S. Lighting customers' facilities, possibly at K–Mart, J.C. Penney, Service Merchandise, Osco Drug, and Venture Stores. Mo-

nin Aff. ¶ 3. After this initial telephone solicitation, Masters forwarded to Monin a brochure (Exh. E) describing Energy Savers; additionally, other promotional materials on Energy Savers have been published in a national trade publication, Energy User News. Monin Aff. ¶ 4. Masters was familiar with U.S. Lighting and its operations; earlier, when Masters was an employee and officer with Remtec, Inc., U.S. Lighting purchased a Remtec power-reducing product called "No Watt," for installation at several K–Mart stores. After the No Watt product began to malfunction, Remtec resolved all customer complaints without cost to U.S. Lighting. *Id.,* at ¶ 5. In 1985 and 1986, Llerrad corresponded and placed telephone calls to U.S. Lighting; normally, following U.S. Lighting's purchase of Energy Saver from Llerrad, U.S. Lighting instructed Llerrad to deliver, on a specified date, the products at the premises of U.S. Lighting's customers, most of whom were located outside Ohio. *Id.,* ¶ 7 & Exh. C (shipped to stores in Tennessee, Indiana, Ohio, Michigan, Oklahoma, Montana[8]). The billings, though, were forwarded to U.S. Lighting's offices in Willoughby, Ohio. *Id.* On at least one previous occasion, substantial quantities—3,000 Energy Savers that U.S. Lighting purchased—were delivered to U.S. Lighting so that U.S. Lighting could have immediate replacements. *Id.,* at ¶ 8 & Exh. C.

In the Energy Savers shipments at issue in this case, Llerrad once again delivered, at U.S. Lighting's request, in several shipments, at specified times, the U.S. Lighting purchases to Venture Stores in Iowa, Illinois, Missouri, Kansas. U.S. Lighting was billed by Llerrad, and instructed Llerrad as to the dates to ship the Energy Savers (June through July 1986) and that the shipping label should read "Hold for United States Lighting crew." Exh. D (Letter of James Tritt, U.S. Lighting Production Manager to Masters). U.S. Lighting alleges

---

7. The Masters Affidavit is used only to give some context; for *prima facie* purposes, contrary allegations in U.S. Lighting's affidavit are treated as true, and conflicts are resolved in U.S. Lighting's favor. *Serras,* 875 F.2d at 1215.

8. Energy Savers were shipped to Osco store in Bozeman, and Miles City, Montana. Those persons fortunate enough to visit this part of the country undoubtedly are impressed with its great beauty and its excellent fishing.

that it maintains ownership of these malfunctioning, commercially unmarketable products.

The Motion to Dismiss, as well as the Reply Brief [9], emphasizes that the products were not delivered in Ohio, and thus, no business was transacted in Ohio. U.S. Lighting argues that the Energy Savers were sold in Ohio, (the billing went to U.S. Lighting), **but the delivery and installation of U.S. Lighting's goods took place outside of Ohio.**

As an argument defeating the first *Southern Machine* factor—purposeful availment of the privilege of acting in Ohio—the general absence of deliveries or installation of products could have an initial attractiveness. On the other hand, when the seller in a commercial contract performs, at the request of the buyer, a service that is for the buyer's convenience, it is harder to argue that the seller has not purposefully "reach[ed] out beyond one state and creat[ed] continuing relationships and obligations with citizens of another state ... [which are] subject to regulation and sanctions in the other State for the consequences of their activities." *Lak v. Deer Creek Enterprises*, 885 F.2d at 1300 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985)); *Creech, supra*, 908 F.2d at 79. Constitutionally requiring the delivery, or presence, in a commercial sale for goods, chattel, or personal property in the forum state, instead of looking at the parties and their continuing relationship seems akin to requiring presence of persons within the forum state. Justice Brennan stated:

> Although territorial presence will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. **So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.** *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774–75 [104 S.Ct. 1473, 1478, 79 L.Ed.2d 790], *Calder v. Jones*, 465 U.S. [783] at 788–790 [104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804]; *McGee v. International Life Insurance Co. v. Cullen*, 318 U.S. 313, 317 [63 S.Ct. 602, 605, 87 L.Ed. 777] (1943).

*Burger King Corp. v. Rudzewicz*, 471 U.S. at 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely because of "random," "fortuitous," or "attenuated" contacts. *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183. Entering into a series of contracts for specific, expressly warranted goods, delivered according to terms with a customer over a number of years is hardly random or fortuitous.

Soliciting business across state lines (such as the brochure and trade journal advertisement) is not, *ipso facto*, a random or fortuitous contact. Advertising directed at Ohio residents is an activity that constitutes "reaching out." Such advertising may take the form of display ads, brochures, or television broadcasts. *Creech, supra*, 908 F.2d at 79 (citing cases.)

Under *Southern Machine*, another formulation of the first factor is causing a consequence in the forum state. Obligations created by the defendant, by contract, could have a realistic and foreseeable impact upon the commerce of the forum State. There is a contractual obligation to provide goods that conform to express warranties. Ohio citizens will justifiably rely

---

**9.** It does not appear that a Motion for Leave to file a Reply Brief was made pursuant to Local Rule 3.02. In substance, however, the Reply Brief is properly restricted to matters raised in U.S. Lighting's Brief in Opposition and focuses the issues for the Court, and since U.S. Lighting has not objected to this relatively minor, but sometimes important procedural error, the Court will entertain the Reply Brief.

on such warranties; the breach of such warranties will often have consequences to an Ohio citizen.

Under the second *Southern Machine* factor, the cause of action must arise from the Defendant's actions. An action "will be deemed not to have arisen from the defendant's contacts with the forum state only when they are unrelated to the operative facts of the controversy." *Creech, supra,* (citing *Third National Bank v. Wedge Group Inc.,* 882 F.2d 1087, 1091 (6th Cir.1989), cert. denied, — U.S. —, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990)) (citing *Southern Machine,* 401 F.2d at 384 n. 29). The second factor has been met: the contractual breaches of warranties (Energy Savers of a certain capacity and quality) arose from Llerrad's continuous reaching out to supply Energy Savers to U.S. Lighting. As the Sixth Circuit has explained:

> Defendant's transaction of business in Ohio—its entering of a contractual relationship with an Ohio corporation is necessarily the very soil from which the action for breach grew. The intimate relationship between the jurisdictional basis and the cause of action necessary to the validity of any single act, long-arm jurisdictional assertion cannot be denied here. *In Flight Devices v. Van Dusen Air, Inc.,* 466 F.2d 220, 229 (6th Cir. 1972).

The third factor of the Southern Machine test asks whether, in light of the first two factors, the assertion of personal jurisdiction would be reasonable. When the first two factors are met, there is an inference that the third factor is met, and only the unusual case will not satisfy the third factor. *Wedge Group, supra,* 882 F.2d at 1092 (6th Cir.1989); *First National Bank of Louisville v. J.W. Brewer Tire Co.,* 680 F.2d 1123, 1126 (6th Cir.1982). Nothing is presented to show that the exercise would be unreasonable.

Thus, the Court holds that U.S. Lighting has met its *prima facie* burden.

### C. Motion to Dismiss Under 12(b)(6)

█ Underwriters seeks dismissal of the claims against it—Count III of the Amended Complaint—because it fails to state a claim upon which relief can be granted against it.

Under the applicable standard for entertaining a Motion to Dismiss, "the court must accept as true all factual allegations in the complaint," *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984), and must "deny the motion to dismiss unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277, 279 (6th Cir.1987) (*en banc*); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). When negligence issues are involved, there is a strong presumption against granting the motion. *See United States v. City of Redwood,* 640 F.2d 963, 966 (9th Cir.1981).

U.S. Lighting argues that a *negligence* action may be maintained against a "product endorser," such as Underwriters, when the product endorser fails to exercise reasonable care when it undertakes to perform its testing procedures, or in accurately communicating its testing results to others. U.S. Lighting argues that Underwriters is not, in any strict sense, a manufacturer, a professional consultant rendering services as part of the manufacturing process, a manufacturer's agent, supplier, or a seller of goods. If this were so, then, as Underwriters argues, in products liability actions, the "economic loss rule"[10] should apply and bar U.S. Lighting's claims against it.

---

**10.** The economic loss rule is explained in *Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Ins. Co.,* 42 Ohio.St.3d 40, 43–44, 537 N.E.2d 624 (1989). Generally speaking, "a defective product can cause three types of damage: personal injury, property damage, and economic loss. *Chemtrol,* 42 Ohio St.3d at 43, 537

N.E.2d 624 (citing *Mead Corp. v. Allendale Mutual Insurance Co.,* 465 F.Supp. 355 (N.D.Ohio 1979)). Unlike personal injuries or property damage, economic loss is sustained by one who possesses the defective product. Economic loss may be described as the loss of the benefit of the bargain. Under Ohio law, economic loss

Thus, it becomes very important how one classifies Underwriters—which U.S. Lighting has not alleged to be a manufacturer or supplier, or a manufacturers' agent. Under Rule 12(b)(6), the Court must assume that truth of the allegations; therefore, there seems to be no need at this time to dwell upon the economic loss rule.

In a nutshell, U.S. Lighting argues that Underwriters, as a professional product endorser, tests and approves products, communicates the results of its testing (safe and approved, etc.) to others, places its "UL" label on the product, akin to a "good housekeeping seal." Because of the desireable UL mark, U.S. Lighting alleges it was induced to buy Energy Savers. If these Energy Savers were negligently tested by Underwriters, or if Underwriters negligently allowed its endorsement to be used by Llerrad, (and third parties reasonably relied upon Underwriters), Underwriters should be liable.

As support, U.S. Lighting cites the Restatement of Torts, § 324A, which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person on the undertaking.

U.S. Lighting cites several decisions holding that alleged negligence by product endorsers is actionable. In *Hempstead v. General Fire Extinguisher Corp.*, 269 F.Supp. 109 (D.Del.1967), involving a fire extinguisher tested and approved by Underwriters, Judge Steel found:

Underwriters neither manufactured nor sold the extinguisher. No privity of contract or any other legal relationship existed between Underwriters, the plaintiff, the plaintiff's employer, or plaintiff's coworker who was handling the extinguisher at the time of its explosion.

*Id.*, at 111.

The Court recognized that a product endorser, such as Underwriters, could be liable to a third party for its negligence. In denying Underwriters Motion for Summary Judgment in *Hempstead*, the Court stated:

Under the principles stated in section 324(A), subparagraph (a), Underwriters would be liable ... If plaintiff succeeds in proving his charge that Underwriters was negligent in approving the design of a fire extinguisher which was imminently dangerous, and that plaintiff's injury was a result thereof, Underwriters must respond in damages.

*Id.* at 118.

Similarly, in *Hanberry v. Hearst Corp.*, 276 Cal.App.2d 680, 81 Cal.Rptr. 519 (1969), a shoe purchaser sued a product endorser—the publisher of Good Housekeeping magazine—which allegedly undertook to test the product. Products meeting the

---

can be described as direct or indirect. Direct economic losses includes the loss attributable to the decreased value of the product itself; it may be described as the loss of the benefit of the bargain, or the difference between the actual value the product would have, if it were not defective.

Indirect economic loss includes the consequential losses sustained by the purchaser of the defective product, which may include the value of production time lost and the resulting lost profits. *Chemtrol,* 42 Ohio St.3d at 43–44, 537 N.E.2d 624.

In economic loss, the remedy lies in contract, not tort. But as *Chemtrol* recognized, "deter-

mining whether recovery in tort is available for damage to the defective product itself requires more than simple labeling of that damage as 'property' or 'economic'." *Id.*, at 44, 537 N.E.2d 624. In analyzing such damage, the "better practice" is to view it "within the context of the transaction, considering the relationship between the parties, the nature of the product's defect, and the manner in which the damages were sustained." *Id.*

Here, the U.S. Lighting and Underwriters are not contractually related—like U.S. Lighting and Llerrad. Arguably, there may be a basis for recovery in tort.

Good Housekeeping Seal were allowed to advertise in the magazine, and the manufacturer could attach the Good Housekeeping Seal to the product itself. The Court stated:

> Implicit in the seal and certification is there presentation respondent has taken reasonable steps to make an independent examination of the product endorsed, with some degree of expertise, and found it satisfactory. Since the very purpose of respondent's representations concerning them, in some instances, even more than upon statements made by the retailer, manufacturer or distributor.
>
> Having voluntarily involved itself into the marketing process, having in effect loaned its reputation to promote and induce the sale of a given product, the question arises whether respondent can escape liability from injury which results when the product is defective and not as represented by its endorsement. In voluntarily assuming this business relationship, we think respondent Hearst has placed itself in the position where public policy imposes upon it the duty to use ordinary care in the issuance of its seal and certification of quality so that members of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of harm. *Connor v. Great Western Sav. & Loan Ass'n, supra*, 69 Cal.2d 850, 865, 73 Cal.Rptr. 369, 447 P.2d 609.

*Id.*, at 684, 81 Cal.Rptr. 519.

If this case is governed by the above precedent, then the Motion to Dismiss should be denied.

The Court interjects one issue that may eventually have to be briefed—in a diversity case, a federal court applies the choice of law rules of the forum state. *Klaxon v. Stentor Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Ohio Supreme Court has explicitly adopted the Restatement (Second) of the Law of Conflicts for determination of the law applicable to contract and tort actions. *See Nationwide Mutual Insurance Co. v. Ferrin*, 21 Ohio St.3d 43, 487 N.E.2d 568 (1986) (contracts); *Morgan v. Biro Manufacturing Co.*, 15

Ohio St.3d 339, 474 N.E.2d 286 (1984); *Laux v. Juillerat*, 680 F.Supp. 1131, 1136 (S.D.Ohio 1987) (Rice, J.). Under Section 146 of the Restatement, there is a presumption that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. *Auto–Owners Insurance Co. v. McMahon*, 48 Ohio App.3d 38, 548 N.E.2d 275 (1988).

The place of injury is unclear. Since other jurisdictions allow recovery for negligence by product endorsers, and the law is not settled, this Court can not say that the facts, as pleaded, do not state a claim. Therefore, the Motion to Dismiss is DENIED.

### D. Conclusion

Accordingly, the Motions to Dismiss for Lack of Personal Jurisdiction and the Motions to Dismiss for Failure to State a Claim upon which relief can be granted are DENIED.

IT IS SO ORDERED.