**UNITED STATES LIGHTING
SERVICE, INC., Plaintiff,**

v.

**The LLERRAD CORPORATION, d/b/a
Fluor–Tech, et al., Defendants.**

**No. 1:89 CV 315.**

United States District Court,
N.D. Ohio, E.D.

July 13, 1992.

John S. Chapman, Schneider, Smeltz, Ranney & LaFond, Cleveland, Ohio, for plaintiff.

Eugene B. Meador, Kitchen, Messner & Deery, Cleveland, Ohio, for the Llerrad Corp. d/b/a Fluor–Tech.

Rita A. Bartnik, Arter & Hadden, Cleveland, Ohio, and Michael Zazzara, Chicago, Ill., for Underwriters Laboratories.

## ORDER

BATTISTI, District Judge.

Before the Court are motions for summary judgment filed by Plaintiff United States Lighting Service (U.S. Lighting) and Defendant Underwriters Laboratories, Inc.

---

(UL). For the reasons set forth below, both motions are denied.[1]

## FACTUAL BACKGROUND

On August 3, 1990, the Court denied motions to dismiss filed by the Llerrad Corporation (Llerrad) and UL. *United States Lighting Service, Inc. v. The Llerrad Corporation,* 745 F.Supp. 426 (N.D.Ohio 1990). On May 21, 1992, the Court heard oral arguments on motions for summary judgment filed by UL and U.S. Lighting. At that time, it denied the motions and indicated that the present order would follow.

Plaintiff U.S. Lighting is an Ohio corporation that purchases, installs and services lighting equipment for commercial establishments. In May 1987, U.S. Lighting purchased 7,145 Fluor–Tech Energy–Savers from Llerrad. It then installed the Energy–Savers for one of its customers. Shortly after the Fluor–Tech Energy–Savers were put into operation, some of them began to burn, melt, malfunction and self-destruct. The problems with the Energy–Savers resulted in fires which scorched the ceiling tiles around the lights. Pl.Ex. 5. Upon notification of these problems, U.S. Lighting removed the lights, and determined that 965 of 7,145 had malfunctioned and self-destructed. *See U.S. Lighting,* 745 F.Supp. at 427; Monin Aff.Supp. at 2; Pl.Ex. 4. During the course of events, U.S. Lighting retained ownership of the Energy–Savers.

Defendant UL is a Delaware corporation with its principal place of business in Illinois. It is an independent and not-for-profit testing organization that, for a fee, examines and approves or disapproves of products submitted by its clients. Coen Aff. at 1. UL is involved in the litigation because it had approved the Energy–Savers as meeting its standards. Llerrad marketed the Energy–Savers as bearing the UL label. Pl.Ex. 3. The manner in which UL evaluated the Energy–Savers deserves further explanation.

In June 1984, Llerrad sought an evaluation of its Energy–Savers. In February 1985, UL informed Llerrad that Energy–Savers did not meet UL standards.[2] Some time thereafter, UL also informed Llerrad that two other products were eligible for UL listing. *See* Pl.Ex. 7.

In July 1986, Llerrad again requested review of the Energy–Savers, following UL procedures for products substantially similar to ones previously approved for UL listing. For reasons that are unknown, two separate groups of engineers began independent investigations.

On August 1, 1986, a group of engineers found that Energy–Savers were within UL standards. Thus, Energy–Savers were approved for UL listing. Pl.Ex. 9, 10, 13. UL prepared a card text for Energy–Savers, which is its document showing approval of a product.

On September 5, 1986, however, another group of engineers found that Energy–Savers did not comply with UL standards. In particular, the product failed a temperature test. Pl.Ex. 12. Thus, Energy–Savers should not have been approved for UL listing. Pl.Ex. 15. UL later stated in a telegram to U.S. Lighting:

> After reviewing the past correspondence, we found that [Energy–Savers] [were] added in the card text mistakenly during other revision work under project 86SC12773. Our records show that [Energy–Savers] [were] investigated in Project 86SC12929 and unacceptable results were obtained. ¶ In view of the above, we are deleting [Energy–Savers] from the card text of file E92625. We apologize for any inconvenience or confusion that this may cause you . . .

*Id.*

It was only after the events giving rise to this litigation, on May 24, 1988, that UL amended the card text to show that the Energy–Savers in fact did not meet its standards. Pl.Ex. 15. It is unclear wheth-

---

1. During oral argument, Plaintiff's motion for leave to file was granted.

2. This earlier decision apparently was reached by evaluating the construction and not on the basis of a temperature test.

er prior to that revision of the card text, UL made any efforts to correct its error.

U.S. Lighting and UL did not have any contractual arrangement. When UL authorized Llerrad to affix the UL mark to the Energy–Savers, those two companies entered into a follow-up service agreement. Under the terms of that agreement, Llerrad agreed not to use the UL mark on products "not made in compliance with the Procedure and other requirements of UL." Def.Ex. C. In addition, Llerrad agreed that use of the mark "constitute[d] a declaration" of compliance with UL requirements. Finally, Llerrad agreed:

> UL in performing its functions in accordance with its objects and purposes does not assume or undertake to discharge any responsibility of [Llerrad] to any other party or parties. [Llerrad] recognizes that the opinions and findings of UL represent its judgment given with due consideration to the necessary limitations of practical operation and in accordance with its objects and purposes and agrees that UL does not warrant or guarantee its opinions or that its findings will be recognized or accepted.

*Id.*

In the present action, U.S. Lighting seeks damages in the amount of the cost of purchasing Energy–Savers, the cost of installing them, expected profit upon their installation, and costs associated with their removal. At the time of its motion for summary judgment, these damages totalled approximately $115,000.00.

Although both U.S. Lighting and UL had claims against Llerrad, it apparently has filed for bankruptcy in the United States Bankruptcy Court for the Central District of California. While U.S. Lighting and UL have indicated that they wish to continue prosecution against Llerrad, neither of their motions contain discussions of claims against Llerrad, or the effect of bankruptcy proceedings. In any event, Llerrad is no longer presenting an active defense in this matter.

## DISCUSSION

### I. THE EXISTENCE OF A DUTY OF CARE

Jurisdiction is premised on diversity of citizenship. At the time of the earlier order the choice of law had not been determined, but it now is clear that Ohio law governs the case.

█ As a threshold issue, Defendant UL argues that Ohio courts have not recognized a cause of action against it. In essence, UL asserts that it does not owe any duty of care to a purchaser of a product bearing its mark. In the absence of a duty of care, U.S. Lighting cannot maintain a negligence action. "The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265 (1989) (listing elements of negligence action). As the Court finds that UL owed a duty of care to U.S. Lighting, the latter may maintain a negligence action.

The parties and the Court have not located any Ohio decision addressing the potential liability of a product endorsement service. Only a few courts from other jurisdictions have considered the subject, but an increasing number have recognized an action in negligence. *See cases collected in* H. Rockwell, Annotation, *Product Liability of Endorser, Trade Association, Certifier or Similar Party Who Expresses Approval of Products*, 1 A.L.R. 5th 431 (1992). *See, e.g., Hanberry v. Hearst Corp.*, 276 Cal.App.2d 680, 81 Cal.Rptr. 519 (4th Dist.1969) (allowing negligence claim concerning Good Housekeeping Seal under California law); Restatement (Second) of Torts § 324(A), § 552. Three cases contain discussions of a negligence action against UL in particular. *Hempstead v. General Fire Extinguisher Corp.*, 269 F.Supp. 109 (D.Del.1967) (cause of action under Virginia law); *Yassin v. Certified Grocers of Illinois, Inc.*, 150 Ill.App.3d 1052, 104 Ill.Dec. 52, 502 N.E.2d 315 (1st Dist.1986) (cause of action under Illinois law); *Benco Plastics, Inc. v. Westinghouse Electric Corp.*, 387 F.Supp. 772 (E.D.Tenn.1974) (no cause of action under Tennessee law).

Two of the three decisions concerning UL recognize a cause of action sounding in negligence. *Hempstead,* the earliest case, concerned a fire extinguisher certified by UL. It was discussed in the Court's prior opinion. *See U.S. Lighting,* 745 F.Supp. at 433. *Yassin,* decided by an intermediate appellate court in Illinois applying its own state law, concerned a commercial meat tenderizer which had caused physical injury to the plaintiff. *Yassin,* 104 Ill.Dec. at 56–57, 502 N.E.2d at 319–20. *Yassin* affirmed the trial court, which had directed a verdict in favor of UL on a strict liability theory, and instructed the jury on liability for UL on a negligence theory. The jury returned a verdict for UL. The appellate court observed that very little case law had developed around claims against independent testing laboratories. It cited *Hempstead,* but concluded without further discussion, "[w]e assume, without deciding, that such suits against independent testing laboratories can be brought in Illinois as well ..." *Id.* at 67, 502 N.E.2d at 330.

The only contrary decision is *Benco Plastics,* where the allegedly defective product was a lampholder for neon lighting used in signs. Again, the product carried UL approval. Although *Benco Plastics* and the present case are superficially similar in that both involve lighting, the *Benco Plastics* opinion is neither binding nor persuasive. The opinion followed a bench trial and is expressly limited to the particular fact pattern. *Benco Plastics,* 387 F.Supp. at 786. The court was influenced "most importantly" by the possible recovery that would be available despite dismissal of claims against UL. *Id.* Furthermore, the public policy motivations for the holding are taken into account through the requirements of a negligence action, as discussed *infra.*

The parties have cited only one other case concerning the UL mark which may have some relevance. *Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories, Inc.,* 906 F.2d 1568 (Fed.Cir.1990). *Midwest Fabricators* does not offer much support for either party. It concerned a manufacturer of polyvinyl chloride conduit fittings which sought cancellation of the UL mark's registration with the Patent and Trademark Office. The manufacturer argued that the UL mark was not used solely for certification, because it represented only a claim by the manufacturer and not UL itself, and that UL failed to control use of its mark, resulting in products carrying counterfeit UL approval. The *Midwest Plastic* Court noted that UL had "a vast network of inspectors making hundred of thousands of inspections across the country," and concluded that the inspection and follow-up procedures were not required to be absolutely foolproof. But its observations were in the context of patent and trademark registration. *Id.* at 1571 (internal quotations omitted). Hence, its statements do not foreclose but perhaps strengthen negligence actions where UL in fact may have erred in its testing procedure.

The rationale underlying a duty of care for product endorsers was explained best in *Hanberry,* 81 Cal.Rptr. 519. The *Hanberry* court allowed an action against the publisher responsible for the Good Housekeeping Seal, which had been given to a brand of shoes which allegedly were defectively designed. The Court reasoned:

Since the very purpose of respondent's seal and certification is to induce consumers to purchase products so endorsed, it is foreseeable certain consumers will do so, relying upon respondent's representations concerning them, in some instances, even more than upon statements made by the retailer, manufacturer or distributor. ¶ Having voluntarily involved itself into the marketing process, having in effect loaned its reputation to promote and induce the sale of a given product ... [i]n voluntarily assuming this business relationship, we think respondent [publisher] has placed itself in the position where public policy imposes upon it a duty to use ordinary care in the issuance of its seal and certification of quality so that members of the consuming public are not unreasonably exposed to the risk of harm.

*Id.* at 522 (citation omitted). *See also U.S. Lighting,* 745 F.Supp. at 433–34.

This reasoning applies with equal strength to the UL mark. The raison d'etre of the UL mark is to show that a product has met safety standards. By offering its mark to manufacturers, UL has placed itself into the stream of commerce. The publisher of the Good Housekeeping Seal gained advertising revenue from its use and "[the] endorsement and approval of a product is not confined to the pages of its own magazine." *Id.* Likewise, UL is paid by corporations seeking use of its mark, who then use the mark for promotional purposes. In some segments of the marketplace, the UL mark has great importance. Manufacturers desire UL approval and their customers expect it. Even though plaintiffs ordinarily pursue remedies in contract or tort against those parties more directly involved with defective products, e.g., Llerrad, they also should be able to seek recovery against UL where it, too, has been negligent. The UL seal does not guarantee that a manufacturer has acted with ordinary care but sound public policy requires that UL act with ordinary care in the conduct of its own business—the certification process.

The plaintiffs in *Hempstead* and *Yassin* raised claims that were slightly different than advanced by U.S. Lighting in the instant case. In both of the earlier cases, there appears to have been no dispute over whether UL followed its internal procedures in testing. The focus was whether the ultimate decision to give UL approval was negligent. In contrast here, it may be that no dispute exists over whether Energy–Savers met the requirements for UL approval. It seems that they did not. The focus may be on whether UL failed to comply with internal procedures for testing, specifically by conducting two investigations. The instant case is more compelling because it does not require any second-guessing of a UL standard, but rather a determination of whether UL made a mistake in its testing process.

It is important to note that U.S. Lighting is bringing its claim not as one of strict liability but rather one of negligence. *See Hanberry*, 81 Cal.Rptr. at 524; *Yassin*, 104 Ill.Dec. at 66–67, 502 N.E.2d at 329–30. The public policy considerations that would weigh heavily against the former do not apply with the same force against the latter. *Cf. Benco Plastics*, 387 F.Supp. 772. In the absence of negligent conduct on the part of UL, which proximately caused the damages, a recovery against UL would lie beyond the limits of tort theory. Only then would UL be correct in arguing that its mark had been made into a guarantee.[3] The policy considerations, such as the fact that UL provides a valuable service to society, cannot serve to insulate UL from liability altogether. The contractual relationship between UL and its customers, which may well form the basis for recovery by UL against its customers, also does not affect third parties.

## II. THE ECONOMIC LOSS RULE

■ As the Sixth Circuit has explained, "[i]n the absence of a controlling decision on the issue at hand, federal courts must attempt to predict how the state courts will act in the future ..." *Vaughn v. J.C. Penney Co., Inc.*, 822 F.2d 605, 607 (6th Cir.1987). Where, as here, no state case law is controlling, this process is to some extent a legal fiction. It is not worthwhile to attempt to anticipate state courts as though predictions were made easily. Nonetheless, it is necessary to view the UL case law in light of Ohio tort law generally in order to determine whether the negligent misrepresentation claim would be accepted by state courts.

In its motion for summary judgment, UL relies on Ohio cases to the effect that, in the absence of privity, pure economic loss cannot be recovered in a negligence action. UL urges the conclusion that the precedents discussed above would be rejected by Ohio courts because of the economic loss rule. *See Chemtrol Adhesives, Inc. v.*

3. The negligence cause of action against a product endorser is subject to other limitations as well. It cannot be maintained, for example, against a magazine publisher that printed an advertisement without any express product endorsement on its part. *See Walters v. Seventeen Magazine*, 195 Cal.App.3d 1119, 241 Cal.Rptr. 101 (4th Dist.1987).

*American Manufacturers Mutual Insurance Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989); *Floorcraft Floor Covering, Inc., v. Parma Community General Hospital Association*, 54 Ohio St.3d 1, 560 N.E.2d 206 (1990). U.S. Lighting responds by arguing that the present case is similar to an Ohio case allowing a claim of negligent misrepresentation in the absence of privity against an accounting firm. *See Haddon View Investment Co. v. Coopers & Lybrand*, 24 O.O.3d 268, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982).

This Court's earlier opinion addressing the economic loss rule did not reach a firm conclusion. *See U.S. Lighting*, 745 F.Supp. at 432–33 n. 10 ("Arguably, there may be a basis for recovery in tort.") It is now necessary to examine the issue in depth. None of the three cases is directly on point, but the economic loss rule expressed in *Chemtrol* and *Floorcraft* is not as applicable as the negligent misrepresentation claim established by *Haddon View*. It would seem, then, that the courts of Ohio would follow *Haddon View* and find a duty of care on the part of UL, and this Court so holds. However, Plaintiff cannot recover anticipated profits.

The leading case on the economic loss rule, *Chemtrol*, concerned a product known as an arch dryer. Plaintiff Chemtrol hired Defendant Midland–Ross to design and build an arch dryer, which allegedly failed to function as expected. The Ohio Supreme Court stated that "[g]enerally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss." *Chemtrol*, 42 Ohio St.3d at 43, 537 N.E.2d 624. It then analyzed the damage done by a product to itself. Such damage "is by definition 'property damage,'" though at times it has been characterized as both property damage and economic loss. The *Chemtrol* court concluded, however, that "the better practice is to analyze such damages within the context of the transaction, considering the relationship between the parties, the nature of the product's defect, and the manner in which damages were sustained." *Id.* at 44, 537 N.E.2d 624. Under such an approach, the existence of a contractual relationship between the parties, which included a warranty, governed to the exclusion of tort remedies.

After *Chemtrol*, the Ohio Supreme Court decided *Floor Craft*, 54 Ohio St.3d 1, 560 N.E.2d 206. In *Floor Craft*, the plaintiff was a contractor that had installed flooring pursuant to a design by the defendant architectural firm. The material subsequently developed bubbles, allegedly because the underlying concrete had not been properly cured and it had excess water which reacted with the flooring adhesive. The parties were not in privity. After reviewing cases from other jurisdictions involving design professionals, the *Floor Craft* court held that "[i]n applying the legal philosophy of these latter cases, we conclude that recovery for economic loss is strictly a subject for contract negotiation and assignment. Consequently, in the absence of privity of contract no cause of action exists in tort to recover economic damages from design professionals involved in drafting plans and specifications." *Id.* at 8, 560 N.E.2d 206. "There is no nexus here that can serve as a substitute for contractual privity." *Id.*

The trilogy of cases cited by the parties is completed by *Haddon View*, 70 Ohio St.2d 154, 436 N.E.2d 212. In *Haddon View*, the plaintiffs were investors who relied on but were not clients of the defendant accounting firm. Even though the plaintiffs were involved in a partnership which had a contractual relationship with the defendant, the plaintiffs themselves were not in privity with the defendant. Nevertheless, the Ohio Supreme Court concluded that the plaintiffs could maintain a cause of action asserting negligent misrepresentation. It stated, "an accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen." *Id.* at 157, 436 N.E.2d 212.

This Court has previously had the opportunity to consider the economic loss rule. *Erie Insurance Exchange v. Lewis*, 1:88 CV 3714, 1991 WL 405542 (N.D.Ohio July

18, 1991). In *Erie Insurance*, Plaintiff Mellon Bank sued, among others, Defendant George R. Lewis, arguing that a fire which had damaged its leasehold had been caused by negligence on the part of Lewis, an architect. Mellon Bank alleged that the fire started because of the placement of hot water pipes, which had been authorized by Lewis. Lewis argued that he was not in privity with Mellon Bank and could not be held liable for what he termed economic loss, including such costs as advertising and promotional loss, staff hours, officer hours, meals, mileage, executive hours, and utilities and rent loss. This Court held that "these damages do not 'constitute' economic loss but rather consequential damages resulting from fire damage to real and personal property." Accordingly, *Chemtrol Adhesives* and *Floor Craft* did not preclude recovery. The Court characterized economic loss as falling into two categories, "(1) direct economic losses or loss of bargain and (2) indirect economic losses or expectation loss (losses of future business profits and opportunities)." *Id.* 54 Ohio St.3d at 7–8, 560 N.E.2d 206. *See Chemtrol*, 42 Ohio St.3d at 43–44, 537 N.E.2d 624. Aside from physical harm to persons, physical harm to " 'tangible things,' " falls outside the economic loss rule. *Floorcraft*, 54 Ohio St.3d at 3, 560 N.E.2d 206.

Similarly here, real and personal property were damaged. Many of the Energy–Savers self-destructed, and others of them were removed by U.S. Lighting at the request of its customers, because they allegedly posed a safety risk. As a result, U.S. Lighting, which owned the Energy–Savers at all times, has been left with worthless property. Although it is not necessary to rely solely on the fact the Energy–Savers scorched some ceiling tiles, the conclusion that the damage was not strictly economic

loss is further supported by the fact that other property sustained damage. The fortunate fact that no individual suffered personal injury does not prevent recovery.

In sum, the alleged damages are not strictly economic loss. Accordingly, the rule described in *Chemtrol Adhesives* and *Floor Craft* does not apply, except insofar as U.S. Lighting seeks to recover the "benefit of the bargain." That is, its anticipated profits from the Energy–Savers transaction represent only economic loss. It is such anticipated profits that are proscribed by the economic loss rule. At trial, the parties will not be permitted to introduce evidence concerning these anticipated profits, and the jury charge will reflect the economic loss rule.

Following the suggestion of the Ohio Supreme Court that it is not as useful to classify damages in a rigid and simple manner as to examine the context of the cases, it is clear that *Chemtrol* and *Floorcraft* are substantively different from the present case based on the context of the cases as well. *See Chemtrol*, 42 Ohio St.3d at 44, 537 N.E.2d 624.

In *Chemtrol*, the actual privity between the parties and the corresponding opportunity to allocate losses was the decisive factor. Privity runs as a theme throughout the opinion.[4] As another federal district court has recognized, *Chemtrol* applies where privity or a similar relationship exists. *See Jones v. Asgrow Seed Co.*, 749 F.Supp. 832, 835–36 (N.D. Ohio 1990) (discussing *Chemtrol*, 42 Ohio St.3d 40, 537 N.E.2d 624). In *Jones*, the plaintiff had an agency relationship with a third party, which presumably presented an opportunity to allocate losses. Here, U.S. Lighting and UL have no contractual bargain, or substitute such as an agency relationship, that provides or prevents recovery. As a

---

**4.** A few examples are as follows. The Court initially described the case as "a situation where both tort and contract principles are invoked." *Chemtrol*, 42 Ohio St.3d at 42, 537 N.E.2d 624. The contract contained a warranty and limitation of liability. *Id.* at 42–43, 537 N.E.2d 624. Thus, Plaintiff sought to "go outside the contract and assert claims ... based upon various tort theories." *Id.* at 43, 537 N.E.2d 624. The Court was concerned with whether contract or tort

law applies. *Id.* at 45, 537 N.E.2d 624. It reasoned that plaintiff and defendant had been in privity and "[t]herefore, any protection against the product's self-inflicted damage in [this] context is better viewed as arising under the contract and not under the law of negligence." Otherwise, the Uniform Commercial Code would be subverted. *Id.* at 49–50, 537 N.E.2d 624.

consequence, the *Chemtrol* case is not controlling.

In *Floorcraft,* as UL argues, the economic loss rule was applied where the parties did not have a contractual relationship. UL does not follow the reasoning offered by the court, however, that "applying the Restatement [(Second) of Torts] in this context will encompass liability that is otherwise best suited for contract negotiation and assignment," especially because the plaintiff had expressly contracted with another defendant to pursue liability claims against it rather than the defendant which benefitted from the economic loss rule. *Floorcraft,* 54 Ohio St.3d at 7, 560 N.E.2d 206. In contrast here, it would not be feasible to expect contract negotiation and assignment between customers who rely on the UL mark and UL itself. More importantly, the lack of privity led the *Floorcraft* court to inquire as to whether another "nexus" existed between the parties. It concluded that as between architects and contractors, "there is generally no nexus found." *Id.,* 54 Ohio St.3d at 6, *also* at 8, 560 N.E.2d 206. However, even within the design and construction field, it is possible that a sufficient nexus will exist and, as a result, a duty of care is imposed. *See, e.g., In re Hughes–Bechtol, Inc.,* 124 B.R. 1007, 1019–20 (Bankr.S.D.Ohio 1991). Just as the circumstances showed a nexus in *Hughes–Bechtol,* here the UL mark, as a representation of that the product has met a certain standard, serves as the necessary "nexus." [5] It is through its mark that UL has purposefully placed itself into the stream of commerce.

Although the present case does not fit neatly within the confines of *Haddon View,* it is sufficiently similar that an Ohio court would permit the cause of action. To the extent that the Ohio Supreme Court has limited *Haddon View,* it has not done so in a way that affects the present claim. The *Floor Craft* court, for example, distinguished *Haddon View,* but it was concerned with the situation where one of the

defendants sought indemnification from another defendant for alleged negligent misrepresentation. *Floor Craft,* 54 Ohio St.3d at 4. The parallel here would be a claim by Llerrad against UL for alleged negligent misrepresentation. The *Floor Craft* decision sensibly forecloses such a cause of action.

UL also refers to an Ohio Supreme Court decision which limited *Haddon View* by holding that a negligent misrepresentation claim cannot be brought against a newspaper publisher. *Gutter v. Dow Jones,* 22 OBR 457, 22 Ohio St.3d 286, 490 N.E.2d 898 (1986). There, the court was persuaded in large part by First Amendment considerations and to some extent by the fact that newspaper readers constituted too large a group and could not rely justifiably on a newspaper for investment decision-making. Here, UL has not raised any First Amendment defense. None appears available to it. As for the issues of the number of potential plaintiffs and reliance, the purpose of the UL mark is to indicate compliance with accepted industrial standards. More parties may be plaintiffs than the investors in *Haddon View,* but the group is not so expansive as to be unforeseeable. Moreover, it is much more foreseeable that a consumer such as U.S. Lighting would look to the UL mark for an assurance of safety.[6] It would be surprising to hear UL argue that, as a matter of law, its mark cannot be relied on. U.S. Lighting must of course still show that it in fact relied.

Ohio law does not clearly prohibit the instant cause of action. Instead, it appears to offer some support for it. Neither *Chemtrol* nor *Floorcraft* is directly applicable; *Haddon View* appears to be the more closely related case law. On the whole, it seems likely that Ohio courts, faced with the same question, would follow precedents recognizing this cause of action.

## III. OTHER ELEMENTS OF THE NEGLIGENCE ACTION

█ The decision reached here concerns only the duty of care. The existence of a

---

**5.** While U.S. Lighting suggests that *Floorcraft* is limited to design professionals, there is no need to follow that view.

**6.** Plaintiff's attorney put this aptly at oral argument: "Their stock in trade is reliance." Transcript at 28.

duty of care is necessary but not sufficient to Plaintiff's success. Several additional elements of the negligence action remain to be proven. *See Mussivand,* 45 Ohio St.3d at 318, 544 N.E.2d 265. The present record does not provide a basis for finding that U.S. Lighting relied on any representation made by UL, as opposed to Llerrad; that UL breached its duties in its testing and listing procedures; or that the breach was the proximate cause of the problems which developed with the Energy–Savers.[7] U.S. Lighting cannot prevail without establishing each of these elements. In addition, UL has raised the possibility of comparative negligence, on the part of Llerrad and U.S. Lighting. Given that genuine issues of material fact cannot be resolved on the record presently before the Court, summary judgment cannot be granted in favor of U.S. Lighting.

### CONCLUSION

Plaintiff's motion for leave to file is GRANTED. The motions for summary judgment are DENIED.

IT IS SO ORDERED.

---

**7.** UL also argued that the goal of safety engineering, and hence the representation made by its mark, is not perfect products but "fail-safe" products, which when they do fail do so safely. Thus, even if the Energy–Savers were not an especially satisfactory product, they may have satisfied the standard of the UL label. This argument is directed at an appropriate jury instruction and will be taken into consideration in that regard.